[Crim. No. 15968. Second Dist., Div. Five. Feb. 20, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
GEORGE DOUGLAS McFADDEN et al., Defendants and Appellants.

## COUNSEL

Richard H. Levin and Gilbert F. Nelson, under appointments by the Court of Appeal, for Defendants and Appellants.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Ivan Hoffman, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

### FRAMPTON, J. pro tem.*—

*Statement of the Case*

Defendants were jointly charged by information, filed on February 8, 1968, with the murder of one Philibert Pepin. Simpson was charged with a prior conviction of robbery suffered in the County of Los Angeles on July 11, 1967. The public defender was appointed to represent both defendants, however, due to a claim of conflict of interest, the public defender was relieved and private counsel was appointed to represent Simpson pursuant to section 987a, Penal Code.

On March 4, 1968, each defendant entered a plea of not guilty. No denial or disposition of the prior conviction against Simpson appears in the record. Each made a motion to suppress evidence under section 1538.5 of the Penal Code which was set for hearing on March 14, 1968. A motion for severance of the trial, made by Simpson, was denied without prejudice. Following a series of continuances, the hearing on the motion under section 1538.5 commenced on June 11, 1968. During the hearing and on June 12, counsel for the defendants announced that they had been unsuccessful in locating an expert witness to testify in connection with the motion, particularly with respect to a claimed drug-induced confession of Simpson, and moved for a continuance of the hearing to obtain the services of a qualified expert in this respect. The motion for a continuance was denied as was the motion to suppress.

Each defendant waived trial by jury and the cause was submitted on the evidence adduced at the preliminary examination. Each was found guilty of murder, which was fixed as murder in the first degree. Motions for a new trial were made and denied, probation was denied after hearing, and each defendant was sentenced to state prison. Each defendant appeals from the judgment and from the order denying his motion for a new trial.[1]

*Statement of Facts*

On January 14, 1968, Otto Pupillo was the owner of Otto's Liquor Store situated at 852 East Manchester Avenue in the City of Los Angeles.

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

[1]The orders denying the motions for a new trial are not appealable orders and must be dismissed. Such orders may be reviewed on appeal from the judgments. (Pen. Code, § 1237.)

At about 9:45 p.m. that evening he was in the store with Philibert Pepin and Mrs. Pepin, the latter's wife. Mrs. Pepin owned the grocery section of the store. At this time three male Negroes rushed into the store. Mr. Pupillo saw them from behind a two-way mirror and said to Mr. Pepin, "You watch them. I don't like it." Mr. Pupillo then went out in front to the counter. One of the three men pointed a gun at him and said "Get in the back." At this point a second man jumped over the counter, and Mr. Pepin went after him "trying to hold him . . . trying to fight him off." The one who held the gun on Mr. Pupillo reached to hit Mr. Pepin on the back of the head, but missed him. Mr. Pupillo then ran into the back of the store and in the matter of a second he heard "a mess of shots, about six or seven shots." After these shots were fired, Mr. Pupillo and Mrs. Pepin went to the front of the store and found Mr. Pepin trying to walk to the back. He had been shot. Mr. Pepin died on January 15, 1968, from a gunshot wound of the chest.

On the evening of January 14, 1968, Rayfield Mays was some 7 feet distance from the liquor store when he heard several shots. He then saw a person, later identified as Simpson, run around the corner where Mays was standing. Simpson said "Somebody is shooting." A few seconds later a second person, later identified as McFadden, ran by Mr. Mays. About one minute later, a third person came from around the same direction.

While this third person was slumping as he ran, Mr. Mays could not see any blood on him. He appeared to have come from Otto's place. This person ran through a vacant lot adjacent to the liquor store, and when he got about halfway, Simpson, with McFadden, came back to help him. One of the defendants then said to the other "Get the gun." Simpson then grabbed the gun out of the third person's hand as the latter was on the ground. Simpson then looked up, saw Mr. Mays, and said to him, "Don't come any closer or I'll shoot." Just before they left the scene, Simpson again threatened to shoot Mr. Mays. McFadden then said "Come on. Let's get out of here," and both defendants left. They ran south on Wadsworth Street to the corner of 87th Street where they jumped into a 1961 or 1962 brown or bronze, two-door Cadillac.

Mays gave the police an approximation of McFadden's height and told them that his hair was "processed." Shortly after the arrest, Mays identified McFadden at a lineup.

On January 16, 1968, Simpson was arrested by Officer Jerry McCall in the prison ward at the Los Angeles County General Hospital. At this time Officer McCall, who was accompanied by a fellow officer, advised Simpson as follows: "I informed the defendant that he had the right to remain silent; that this meant that he did not have to tell me anything; that if he did

give up the right to remain silent, anything he said could and would be used against him in a court of law. And that he had the right to speak to an attorney and to have the attorney present during questioning. And if he so desired and could not afford an attorney, an attorney would be provided for him without charge before questioning."

Officer McCall then asked Simpson if he understood these rights and the latter replied "Uh-huh, yes." He was then asked by Officer McCall "Do you wish to give up your right to remain silent and to speak with an attorney and to have an attorney present and talk to us about this?" Simpson replied, "Yeah. I didn't kill anybody."

At about 1 p.m. on January 17th, Officers Howard and Skeggs went to the jail ward at the hospital to speak to Simpson. Officer Skeggs asked Simpson if he recalled the police officers talking to him at about noon on the previous day. Simpson replied that he did recall talking to two officers on the previous day. Officer Skeggs then asked Simpson if he recalled being advised of his rights by those officers and Simpson said that he did. Officer Skeggs then asked Simpson if he wanted an attorney now and Simpson said "No."

Officer Howard testified that Simpson made the following statement in response to questions asked by Officer Skeggs directed to an attempted robbery and murder that took place at 852 East Manchester Avenue at approximately 9 p.m. on the 14th of January 1968: "[T]hat he was involved in that robbery; that he had gone there with two other persons in a vehicle. . . . That he had gone to this place—near this location in a tan '61 Cadillac driven by a George McFadden, and that a Clinton Knox was along with them. When they parked the car, George McFadden gave Clinton Knox a .38 caliber revolver; that the three of them proceeded from the vehicle to the location of the liquor store. The three of them entered the liquor store; that he, Leroy Simpson, started to jump over the counter, and that if anyone came down along behind the counter, Clinton Knox was supposed to rap them in the head with the gun. .

"An older man came out of the back of the store with a small chrome gun and so shooting started. At the time that Leroy [Simpson] saw the gun, he jumped off the counter to go out of the store. He stumbled and fell and, as he was getting up, he was shot in the backside. He then exited the store and he heard more shooting. They went back toward the Cadillac. He and George McFadden then returned part of the way back to the liquor store where Clinton Knox had fallen down. He didn't remember for sure which person took the gun from Clinton Knox's hand, but one of them took it; that they pointed the gun at an unknown person on the street and told him, 'Don't come any closer.' At that point they both went to the Cadillac and left."

Officer Howard had been given a description of McFadden, other than the information furnished by the statement of Simpson, as being a "six-foot male Negro . . . around twenty-three to twenty-five years old, with a high process." He then made a check of the local R and I files and found no record of a previous arrest. He then went to the 77th Street station and went though the files relating to field interrogation. There he found cards showing where McFadden had been interrogated in the field on four different occasions. The description on these cards matched the description of McFadden given by Simpson. McFadden's address appeared on one of these four cards.

On January 18, at about 7:30 a.m., Officer Howard, in company with other officers, arrested McFadden at his apartment. The officers found a revolver in the top drawer of a chest of drawers in the bedroom of Mc-Fadden's apartment at the time of the arrest. The witness Mays identified this as being similar in shape, size and length as the gun he observed at the scene of the robbery.

About 1 p.m. on the afternoon of the 18th, in the police station, Officer Howard's partner, Officer Skeggs, in Officer Howard's presence, advised McFadden that "he had the right to remain silent; that he could waive the right to remain silent and talk to us about what had occurred; that he had the right to an attorney of his choice during quesioning and if he could not afford an attorney, one would be provided for him free by the County. . . . that anything he did say could and would be used against him in a court of law." McFadden was then asked if he understood those rights, and he replied "that he was a graduate of Jordan High School and that he did understand English." He further stated that "He did not want an attorney present and that he would talk to us." McFadden then told the officers "that he had been at the Little Fox bar and had met Leroy Simpson and Clinton Knox there at approximately 9:00 o'clock on Sunday evening; that Leroy Simpson had brought up the idea of robbing . . . that Leroy had brought up the idea of robbing a liquor store which was over on East Manchester; that he had said there was two old dudes that run the place and it will be real easy to knock off; that they left the bar in a yellow '64 Chevrolet Malibu and that Leroy drove; that they drove over to 87th and Wadsworth and parked the car westbound on Wadsworth just west of 87th Street. And that prior to leaving the Little Fox bar, that he George McFadden, had gone to a '61 Cadillac and removed a .38 caliber revolver from that car. At the location of 87th and Wadsworth, George gave the gun to Clinton Knox for the purpose of using it in his robbery because he didn't want any part of holding a gun.

"They proceeded to the liquor store and that he, George, went inside the liquor store and stood just inside the doorway; that when he saw the man with the gun, he walked immediately out of the store and watched

what went down—what happened through the window; that when the shooting started, he immediately proceeded across the empty lot back to where the car was parked; that he returned to where Clinton Knox had fallen on the sidewalk. And he wasn't positive whether he or Leroy took the gun from the fallen Clinton Knox.

"They went to the car, and that he, George, drove from the location; that he drove approximately two blocks into a dark area. He stashed the gun and returned about 3:00 a.m. to pick up the gun; that after they left the place of the gun stash, they returned to the Little Fox bar at which time they broke up and went their own ways."

### Motion Under Section 1538.5 Penal Code

Simpson moved under the above section to suppress evidence as to a ballistic report and the bullet removed from his leg.

McFadden moved under the above section to exclude all evidence that resulted from statements that Simpson made to the police when he was questioned at the Los Angeles County General Hospital.

The defendants called as a witness Dr. Bruce Bingham, an intern at the Los Angeles County General Hospital. He testified as an expert in the field of pharmacology as follows: On January 15, 1968, Simpson was admitted to the prison ward of the hospital; on this date he received a suppository, shots of Penicillin, Stretomycin, Tetanus Toxoid and 75 milligrams of Demerol. He underwent surgery on this date, but the hospital records did not show whether the surgery was performed during the morning or during the afternoon of that day. On January 16, 1968, Simpson was given 50 milligrams of Vistaril at 1:45 a.m., and 75 milligrams of Demerol each at 4:05 a.m., 8:45 a.m. and 9:35.

Dr. Bingham testified further that the medication given to Simpson while he was in the hospital (Vistaril and Demerol) were both sedatives, each having an effect which lasts for about three or four hours; it was customary to give medication in the dosages given every four hours and that this was done in the instant case; that there would be no cumulative effects of repeated dosages of Demerol when given every four hours; he would not venture an opinion as to whether or not a person under the influence of Demerol would be more amenable to conversation under questioning than a person not under the influence of such drug; there was no speech impairment as a result of the dosages of Demerol, nor would a person under the influence of Demerol be inclined to make any admissions; the drug Thorazine has similar properties to that of Demerol and has a similar effect, but Hyoscine and Demerol have different properties and effects; a dose of 300 milligrams of Thorazine is substantially greater than

75 milligrams of Demerol; Demerol has no effect on a person's blood pressure.

At this point in the hearing, counsel for Simpson indicated that he had been in telephonic communication with a Dr. Slevin in New York City who was in charge of the medical department of Winthrop Laboratories, the company which manufactures Demerol. He suggested that Dr. Slevin might aid the court in determining the effects of Demerol upon the nervous system. The record indicates that the court and counsel, on June 11, 1968, made some effort to contact a competent medical expert to testify concerning the drug Demerol and its effect upon the nervous system, but without success. The trial judge indicated his willingness to appoint, at the expense of the state, a competent expert produced by either the People or the defendant.

The hearing proceeded and the defendant Simpson testified. He was vague and uncertain about events that occurred during the few days following his operation.

Willie Simpson, the defendant's brother, testified that he went to the hospital on January 16, 1968, and tried to talk to the defendant; a nurse was present in the room; the nurse tried to awaken the defendant but he just opened his eyes, then closed them.

Officer Jerry McCall testified on the hearing that he went to the hospital about 11:45 a.m. on the 16th; after speaking with the head nurse, and after his partner, Officer Sharrett, spoke to a doctor by telephone, they were given permission to interview Simpson; they placed him under arrest at this time and Simpson immediately said, "I didn't kill anybody"; he was told "Wait a minute. I want to advise you of your constitutional rights"; at this time Simpson was given the *Miranda*[2] statement of his rights, stated that he understood them, and said that he was willing to talk to the officers. Simpson, thereupon gave a statement concerning the robbery which was reduced to writing and signed by him. This statement was received in evidence at the 1538.5 hearing. In this statement Simpson denied killing anyone. He said he did not know the others intended to rob the liquor store when they went there, and that a man came out of the back of the store and shot him. He told of driving to a spot around the corner from the liquor store in a beige 1961 Cadillac belonging to Knox [Clinton Knox] and of the car being left parked there while he and his two companions went to the liquor store. He spoke of Knox being shot during the robbery and not being able to make it back to the Cadillac and of the third man taking the gun from Knox's hand, going back to the Cadillac,

[2]*Miranda* v. *Arizona*, 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].

and leaving the scene. He stated further that he then ran home and passed out. He said he went to the Broadway Hospital the following morning and from there to the General Hospital.

Officer McCall testified further that when he saw and talked to Simpson on the morning of the 16th the latter did not have intravenous bottles suspended from his bed, he appeared to be conscious, his eyes were open, and he appeared to be alert. He noticed nothing unusual about Simpson other than the fact that he was lying in bed. Simpson did not appear to be groggy at any time during the taking of his statement.

On January 17, 1968, Simpson was given 75 milligrams of Demerol each at 2 a.m., 6 a.m., approximately 11 a.m., 3 p.m. and 11:30 p.m.

At about 1 p.m. on the 17th of January, Officers Howard and Skeggs went to the jail ward at the hospital to speak to Simpson. They were given permission to do so by a nurse and a deputy sheriff in charge of the jail ward. At this time the conversation occurred which has been heretofore related in the main case. Neither officer was aware that Simpson had been given Demerol.

Officer Howard testified that on this occasion Simpson appeared to be alert and his answers were responsive to the questions asked of him; he remembered the visit of the two police officers on the day before; there was nothing unusual about Simpson's appearance; Simpson told him that the bullet had been removed on the afternoon of the 15th.

The testimony under the 1538.5 motion was concluded on June 11, 1968, and the matter was continued to June 12. On June 12th the record indicates that the court and the prosecutor had made some effort to obtain an expert witness on the question of the effect of Demerol on the human nervous system, but neither had been successful. At this point both defendants moved for a continuance of the hearing to allow them to locate and produce a medical expert on the subject. The motion was denied.

### Contentions on Appeal

Simpson contends that (1) the admission of the confession of McFadden, even though limited in its application by the trial court to McFadden alone, denied him the right of confrontation; (2) the confession obtained from him on January 17, 1968, was an involuntary confession due to drugs administered to him and it was, therefore, error to admit such confession in evidence; (3) he was not advised of his constitutional rights prior to the obtaining of the confession on January 17; (4) he was denied the right to the attendance of witnesses required to prove his defense that his confession was involuntary.

McFadden contends that (1) Simpson's confession was involuntary and such confession assisted the police in obtaining evidence against McFadden which led to his arrest; (2) McFadden's confession and the gun found at the time of his arrest were the inadmissible product of his arrest without probable cause; (3) McFadden's confession was obtained in violation of the rule laid down in *Miranda*.

### The Case as to Simpson

*The McFadden confession.* Simpson urges that his constitutional right of confrontation was denied in the admission in evidence of the confession of McFadden in violation of the rule laid down in *Bruton* v. *United States,* 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620].

The record here discloses that at the outset of the preliminary examination, counsel for Simpson moved for a severance on the ground that McFadden had made certain statements to the police which may have incriminated Simpson. The motion was opposed by the People on the ground that there was no provision of law which required a severance at the preliminary hearing stage of the proceedings. The motion was denied by the magistrate "without prejudice to raise the point at a later stage of these proceedings."

Officer Howard testified to the confession made by Simpson to him and Officer Skeggs at the Los Angeles County General Hospital on January 17, 1968 (referred to previously). This confession was offered and received as evidence only as against Simpson, and was offered and received in part as bearing upon probable cause for the arrest of McFadden. The evidence was received in these respects without objection.

Thereafter, Officer Howard testified to the confession made by McFadden to him and Officer Skeggs on January 18, 1968, at the 77th Street station (referred to previously). Counsel for Simpson objected to the introduction of this statement, reminded the magistrate of his motion for a severance which had been made previously, and renewed such motion. The motion was denied. The magistrate then received the confession, limiting it as evidence against McFadden only.

No defense was offered at the preliminary examination which was held on January 29, 1968.

The information was filed on February 8, 1968. On February 21, 1968, due to a claimed conflict of interest, the public defender was relieved and Mr. Claude Warrell was appointed to represent Simpson. On March 4, 1968, each defendant entered a plea of not guilty and Simpson moved for a severance of the trial. This motion was "denied without prejudice." The motion was not renewed subsequent thereto. Trial of the action and hearing

on the motion under section 1538.5 of the Penal Code was set for March 14, 1968, and after a series of continuances, the motion was heard on June 11 and 12. Simpson moved to suppress the evidence as to a ballistics report and a bullet, apparently relating to the bullet removed from his body on January 15 at the General Hospital. McFadden moved to exclude all evidence that was obtained as a result of the statements made by Simpson to the police. Both motions were denied.

Immediately thereafter a jury trial was waived by both defendants. The People offered to stipulate "that the People's case may be submitted on the transcript of the preliminary hearing; that the witnesses there deemed called, sworn and testified are here deemed called, sworn and testified in accordance with the preliminary transcript; that any exhibits received at the preliminary hearing be deemed offered and received in this court subject to any legal objections, and any stipulations entered at the preliminary hearing be deemed entered into in this court." Simpson, through his counsel, accepted the offer of stipulation, but objected to the receipt in evidence at the trial of People's exhibit 1 received at the 1538.5 hearing.[3] This objection was overruled and the statement was received in evidence for the purposes of the trial only as against Simpson. McFadden, through his counsel, accepted the offer of stipulation "subject to the objections to the confessions already made."

■ At the time of the agreement on the part of defense counsel to submit the cause on the evidence adduced at the preliminary examination, they were both fully aware that the confessions of the respective defendants implicated the other in the commision of the crime for which they were on trial. They were also aware that the rulings of the magistrate had limited the admissibility of such confessions to the defendant who had made it. They also knew that in submitting the case on such transcript, the trial judge would read the record in its entirety and would also limit the admissibility of such confessions at the trial in the same manner as they had been limited by the magistrate at the preliminary examination in accordance with the terms of the stipulation of submission. If counsel for Simpson felt at the time of submission that his client was being deprived of the right of confrontation proscribed in *Bruton* v. *United States,* 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620], the opportunity was still open to renew the motion for severance made by him on March 4, 1968, and which was denied without prejudice. Instead, he submitted the matter on the transcript thereby leading the trial court to believe that he was satisfied in placing the cause before the court on the record before the magistrate. Here, the trial judge did not

[3]People's exhibit 1 is a four-page written statement obtained from Simpson at the hospital on January 16 in which he admitted being at the scene of the robbery but denied that he knew that a robbery was going to take place.

entertain the mistaken view that he was precluded from granting separate trials, as was the case in *People* v. *Massie,* 66 Cal.2d 899, 917 [59 Cal.Rptr. 733, 428 P.2d 869]. Had the motion for severance been renewed at the conclusion of the 1538.5 hearing, the trial court would have been afforded the opportunity of exercising such discretion. In this state of the record Simpson may not be heard to complain that his right of confrontation at the trial was denied him. (See *People* v. *McGautha,* 70 Cal.2d 770, 784-785 [76 Cal. Rptr. 434, 452 P.2d 650].)

■ Here, each defendant had made a full confession to having participated in the attempted robbery which resulted in the homicide. Both confessions were voluntarily made. Each defendant's case was shattered by the impact of his own confession. These confessions in turn were corroborated by eyewitness testimony as well as other evidence. Each confession was in itself, after the establishment of the corpus delicti, sufficient to convict the confessor of the crime of murder in the first degree. No evidence was offered in defense to impeach the evidence offered by the prosecution. "In this setting, the fact that each defendant was also implicated by his codefendant's confession cannot realistically have contributed to either conviction." (*People* v. *Charles,* 66 Cal.2d 330, 338 [57 Cal.Rptr. 745, 425 P.2d 545]; *In re Hill,* 71 Cal.2d 997, 1014-1015 [80 Cal.Rptr. 537, 458 P.2d 449]; *In re Whitehorn* (1969) 1 Cal.3d 504 [82 Cal.Rptr. 609, 462 P.2d 361].) It is apparent that if it can be said that it was error to admit those portions of the confession of McFadden which implicated Simpson, such error was harmless beyond a reasonable doubt. (*Chapman* v. *California,* 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065]; *Harrington* v. *California,* 395 U.S. 250 [23 L.Ed.2d 284, 89 S.Ct. 1726].)

■ Simpson urges that his confession made on January 17 was inadmissible because it was obtained while, and because, he was under the influence of drugs.

Dr. Bruce Bingham testified that on January 15, Simpson was given 75 milligrams of Demerol, along with a suppository and shots of Penicillin, Streptomycin and Tetanus Toxoid. On January 16, he was given 50 milligrams of Vistaril at 1:45 a.m. and 75 milligrams of Demerol each at 4:05 a.m., 8:45 a.m., and 9:35. It was not clear as to whether the last dosage was given in the morning or evening. On January 17, he was given 75 milligrams of Demerol each at 2 a.m., 6 a.m., about 11 a.m., 3 p.m., 7:30 p.m., and 11:30 p.m.

Dr. Bingham testified further that the suppository and shots other than

Demerol given on the 15th of January would have no effect on the nervous system. Vistaril is a sedative drug which acts as a depressant on the central nervous system. It acts to relax the individual and make him more at ease. However, 50 milligrams of Vistaril given on January 15, would last only three to four hours, and would, therefore, be of no consequence on either the 16th or 17th of January, the days that the officers spoke to Simpson.

Dr. Bingham testified that Demerol is also a sedative drug and acts to relieve apprehension and anxiety. It is usually used for the relief of pain. It is customary to give 75 milligrams of Demerol every four hours. There would be no cumulative effect of repeated dosages of Demerol, even though the patient would remain sedated. The effects of Demerol last three to four hours. He talked to Simpson while he was being administered these drugs and the latter was alert and answered all of his questions.

Dr. Bingham testified further that Demerol does not act to reduce blood pressure. The person under its influence is still aware of his environment, is able to communicate with people, and his speech would be in no way impaired by a dosage comparable to that given to Simpson.

On January 16, when Officer McCall spoke to Simpson and advised him of his constitutional rights, the latter was alert and did not appear to be groggy. He was responsive to all questions. The following day when Officer Howard spoke to Simpson, the latter was again alert, appeared unsedated and aware of his surroundings. He, as well as Officer Skeggs, asked questions and Simpson answered those that he could and would explain his answers quite often. He was responsive to the questions asked of him.

On January 16, when Simpson gave his statement to Officer McCall and Officer Sharrett, it was 11:45 a.m., at least two hours after he had been given Demerol. On January 17, when he gave his confession to Officer Howard and Officer Skeggs, it was 1 p.m., at least two hours after he had been given Demerol. Simpson would be less under the effects of Demerol at the time of giving the statements than he would be at the time he was given the drug.

The factual situation in *In re Cameron,* 68 Cal.2d 487 [67 Cal.Rptr. 529, 439 P.2d 633], cited and relied on by Simpson, where the court held that a confession obtained while the defendant was under the influence of drugs was inadmissible, is inapposite to the factual situation presented here. We are of the opinion that under the factual situation shown here, there is substantial evidence to sustain the trial court's finding that Simpson's statements were not drug induced, and were freely and voluntarily given.

Next, Simpson urges that he was not advised of his constitutional rights prior to the obtaining of his confession on January 17. This contention is

without merit. The record discloses that the admonition made to Simpson by the officers prior to obtaining any statements from him, fully complied with the requirements as laid down in *Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]. Simpson was advised of his *Miranda* rights on January 16, stated that he understood such rights and waived them. On January 17, Simpson was asked if he remembered being advised of his constitutional rights on the day before, and he said that he did. He was again asked if he wanted an attorney, and he replied "No." ▊ Where a defendant is given one adequate warning of his constitutional rights relating to police interrogation, and he intelligently waives such rights, it is not incumbent upon the officers to thereafter repeat the warning each time they wish to interrogate him. (*People* v. *Sievers,* 255 Cal.App.2d 34, 37-38 [62 Cal.Rptr. 841]; *People* v. *Johnson,* 70 Cal.2d 469, 476 [74 Cal.Rptr. 889, 450 P.2d 265].)

Simpson urges that he was denied the right to the attendance of witnesses required to prove his defense that his confession was involuntary because he was under the influence of drugs at the time his confession was given to the extent that he was unaware that he was being interrogated. He urges that it was prejudicial error on the part of the trial court to deny his motion for a continuance of the 1538.5 hearing on June 12, 1968, to allow him to obtain the services of a medical doctor, Dr. Slevin, who was located in the City of New York.

On March 4, 1968, when the motion under section 1538.5 was made, counsel was fully aware that the police had obtained a confession from Simpson on January 17, 1968, while he was in the hospital recovering from surgery performed for the removal of a bullet from his body received during the perpetration of the robbery on January 14. There was ample time between March 4 and June 12 for counsel to obtain expert medical testimony favorable to Simpson, if such could be obtained, relating to the effect of the drugs administered during and after the operation upon his ability to understand questions asked of him and to respond to such questions rationally. ▊ The granting of a continuance is generally discretionary with the court. ▊ Counsel for Simpson was afforded reasonable and adequate time (three months and eight days) in which to prepare his defense. No abuse of discretion is shown in denying the motion for a continuance. (*People* v. *Douglas,* 61 Cal.2d 430, 435-436 [38 Cal.Rptr. 884, 392 P.2d 964]; *People* v. *Bourland,* 247 Cal.App.2d 76, 90 [55 Cal.Rptr. 357].)

### *The Case as to McFadden*

McFadden urges that the Simpson confession was involuntary and that

such confession assisted the police in obtaining evidence against him which led to his arrest. For the reasons hereinabove discussed in the case against Simpson, this contention is without merit.

■ Assuming that the Simpson confession was involuntary because, as claimed, he was under the influence of drugs at the time it was given, McFadden has no standing to challenge such violation of Simpson's rights. (*People* v. *Varnum*, 66 Cal.2d 808, 812-813 [59 Cal.Rptr. 108, 427 P.2d 772].) Furthermore, as heretofore pointed out, the cause was submitted on the transcript of the evidence taken at the preliminary examination. At such hearing McFadden did not raise the question of the infirmity of Simpson's confession on the basis that he was under the influence of drugs at the time it was taken. At the conclusion of the 1538.5 hearing, when Simpson's written statement, taken on January 16, 1968, was offered and received in evidence for the purpose of the trial, McFadden's counsel remarked, "I don't think it applies to us, it only applies to Simpson." ■ Thus, the record shows that the attack made on Simpson's confession by McFadden was not raised at the trial level and may not, therefore, be urged for the first time here.

■ McFadden urges that his confession and the gun found at the time of his arrest were the inadmissible products of his arrest without probable cause.

The police, prior to the arrest of McFadden, knew that a homicide had been committed in the course of an attempted robbery perpetrated at 852 East Manchester Avenue at approximately 9 p.m. on January 14, 1968. They had interviewed the witness Mays at the scene of the attempted robbery shortly after it occurred, and it is reasonable to infer that Mays had given information to the police regarding the perpetration of the crime in substance the same as that to which he testified at the preliminary examination. (See *People* v. *Rice,* 253 Cal.App.2d 789, 793 [61 Cal.Rptr. 394].) Mays' recitation of the facts surrounding the commission of the attempted robbery coincides in many particulars with the facts as related in Simpson's confession.

Simpson's confession implicated himself in a crime which, upon conviction, carried a possible death sentence. This confession also implicated McFadden. Simpson's confession was a most serious declaration against his penal interest, and must be considered, therefore, of a peculiarly trustworthy nature. (See *Skelton* v. *Superior Court,* 1 Cal.3d 144, 154, fn. 7 [81 Cal. Rptr. 613, 460 P.2d 485]; *People* v. *Spriggs,* 60 Cal.2d 868, 874 [36 Cal.Rptr. 841, 389 P.2d 377].) In the circumstances here shown, we are of the opinion that Simpson's confession alone, implicating McFadden, was sufficiently trustworthy to furnish probable cause for the arrest of McFadden.

Mays' eyewitness account of the attempted robbery-homicide, and his account to the police, was trustworthy when viewed in the light of probable cause to make an arrest. (See *People* v. *Gardner,* 252 Cal.App.2d 320, 324-325 [60 Cal.Rptr. 321]; *People* v. *Sesser,* 269 Cal.App.2d 707, 711 [75 Cal.Rptr. 297].) If it can be said that Simpson was an untested informant, as that designation has been applied in cases involving violations of the narcotics laws, the corroboration of Simpson's confession afforded by the witness Mays, and the independent identification of McFadden, although slight, obtained from the local police records, was enough to give the officers reasonable grounds to believe that Simpson was telling the truth, for in this type of case the issue is not whether the information obtained by the officers emanated from a reliable source, but whether the officers could reasonably rely upon that information under the circumstances. (See *People* v. *Lara,* 67 Cal.2d 365, 375 [62 Cal.Rptr. 586, 432 P.2d 202].)

 McFadden argues that his confession was obtained in violation of the rule laid down in *Miranda.*

Officer Howard testified that he talked to McFadden about 1 p.m. on the day of the arrest at the 77th Street station. Prior to the conversation Officer Skeggs, in the presence of Officer Howard, told McFadden "that he had the right to remain silent; that he could waive the right to remain silent and talk to us about what had occurred; that he had the right to an attorney of his choice during questioning and if he could not afford an attorney, one would be provided for him free by the county . . . that anything he did say could and would be used against him in a court of law." When asked if he understood these rights, McFadden replied that "he was a graduate of Jordan High School and that he did understand English." Officer Skeggs told McFadden further that he could waive the right to an attorney and waive the right to remain silent, and asked him if he did, in fact, waive those rights. McFadden replied that "He did not want an attorney present and that he would talk to us." The warning given here is in substantial compliance with the warning required by *Miranda,* and the record is sufficient to sustain a finding that McFadden intelligently waived the rights protected thereby.

For the first time, at oral argument, both counsel for the defendants urged that the submission of the case on the testimony adduced at the preliminary examination without a personal waiver on the part of each defendant violated his right of confrontation of the witnesses against him, as guaranteed by the Sixth Amendment to the United States Constitution as construed in *Boykin* v. *Alabama* (June 2, 1969) 395 U.S. 238 [23 L.Ed.2d 274, 279-280, 89 S.Ct. 1709]. In *Boykin* the United States Supreme Court held that "Several federal constitutional rights are involved in a waiver that

takes place when a plea of guilty is entered in a state criminal trial. First is the privilege against compulsory self-incrimination guaranteed by the Fifth Amendment and applicable to the States by reason of the Fourteenth. [Citation omitted.] Second is the right to trial by jury. [Citation omitted.] Third is the right to confront one's accusers. [Citation omitted.] We cannot presume a waiver of these three important federal rights from a silent record." The rule laid down in *Boykin* is not to be applied retrospectively. (*In re Tahl*, 1 Cal.3d 122, 133 [81 Cal.Rptr. 577, 460 P.2d 449].)

In *Tahl,* our Supreme Court, in elaborating on *Boykin,* stated: "As we have indicated, an express waiver on the record has long been required in regard to the right to a jury trial; there appears no sound reason why the court should not likewise advise the accused as to, and obtain an express waiver of, his rights to confrontation and against self-incrimination prior to acceptance of his plea of guilty. We have no doubt that in the course of a trial a waiver of constitutional rights may be implied and need not necessarily be preceded by a full explanation of each right and its consequences. (See *People* v. *Evanson* (1968) *supra,* 265 Cal.App.2d 698, 701-702 [71 Cal.Rptr. 503].) But in proceedings related to a formal plea, at which time the court is required at a minimum to ascertain whether the plea is knowingly made without threat or inducement, it is salutary for the court at the same time to explain the full import of his guilty plea to the accused." (*In re Tahl, supra,* 1 Cal.3d 122, 132-133.)

In *People* v. *Evanson,* 265 Cal.App.2d 698, 701-702 [71 Cal.Rptr. 503], it was urged that the trial court should not have accepted a waiver of jury trial without first giving the defendant full advice concerning his rights and ascertaining through a procedure comparable to that required for an effective waiver of counsel that the waiver was competent. In commenting on this, the court said ". . . where a defendant is represented by counsel it is to be expected that counsel will intentionally refrain from asserting, or advise waiver of, certain constitutional rights from time to time in his choice of defense tactics. It is not necessary that whenever such a tactical waiver occurs the court interrupt the proceedings to advise defendant of the right which is to be waived and question him to ascertain whether the waiver is made with full appreciation of the consequences."

In the case at bench, immediately after the trial court denied the motion to suppress under section 1538.5 of the Penal Code, the following colloquy occurred with respect to waiver of trial by jury:

"MR. CALOF: At this time the defendant McFadden would offer to waive his right to a jury trial and ask that the case be submitted to the court on the basis of the preliminary transcript.

"Mr. Worrell: The same for Simpson.

"The Court: Take the jury waiver, Mr. Prosecutor.

"Mr. Keir: Mr. Simpson, your attorney indicates that you wish to have a trial by court instead of a trial by jury. Do you understand that you are entitled to a trial by a jury of 12 people but that it is a right you may waive or give up; do you understand that?

"Defendant Simpson: Yes.

"Mr. Keir: Have you discussed this with your attorney?

"Defendant Simpson: Yes.

"Mr. Keir: Are you now waiving or giving up your right to a jury trial?

"Defendant Simpson: Yes.

"Mr. Keir: You want this matter heard by the court sitting without a jury?

"Defendant Simpson: Yes.

"Mr. Keir: Mr. Worrell, do you join in the waiver?

"Mr. Worrell: Yes.

"The Court: The court accepts the waiver.

"Mr. Keir: George Douglas McFadden, you also are entitled to a trial by a jury of 12 people but this is a right you may waive or give up; do you understand that?

"Defendant McFadden: Yes.

"Mr. Keir: Have you discussed this with your counsel?

"Defendant McFadden: Yes.

"Mr. Keir: Are you now waiving or giving up your right to a jury trial?

"Defendant McFadden: Yes.

"Mr. Keir: And you want to have this matter heard by the court sitting without a jury?

"Defendant McFadden: Yes, I want a court trial.

"Mr. Calof: I join in the waiver.

"The Court: The court accepts the waiver."

The foregoing jury waivers were followed by the stipulation by counsel for each defendant that the cause be tried on the evidence taken at the

preliminary examination. The minutes disclose that each defendant reserved the right to offer additional evidence. The hospital records relating to Simpson and a paper bearing his signature made in open court during the 1538.5 hearing were received in evidence. Neither defendant chose to take the witness stand or to call other witnesses in his behalf, although such opportunity was reserved under the stipulation of submission. Neither defendant at any time voiced any objection to the procedure, either at the time of the stipulation or at the time of the court's finding of guilt. (Cf. *Brookhart* v. *Janis* (1966) 384 U.S. 1, 3-4 [16 L.Ed.2d 314, 316-317, 86 S.Ct. 1245]; *People* v. *Wheeler* (1968) 260 Cal.App.2d 522, 525-526 [67 Cal.Rptr. 246].) Each defendant was fully aware of the evidence against him, including his confession of guilt.

In passing on the validity of the defendant's waiver of his right of confrontation by submission of the trial of his cause on the transcript of the evidence taken at the preliminary examination, our Supreme Court has held that "It is the fundamental constitutional right of a person accused of crime to plead not guilty to the charge and have a trial by a jury of his peers wherein he can defend himself by confronting and cross-examining witnesses against him and by presenting witnesses in his own behalf. That right may be waived *wholly or in part by the accused*—either by a personal assertion of waiver or by acquiescence in a waiver undertaken by his counsel; it may also in some circumstances be waived *in part by counsel without the consent of the accused,* as when counsel makes a 'tactical decision' not to cross-examine a particular witness or not to place the accused on the stand. However, the fundamental right may not be waived in its entirety by counsel— only the accused himself can do this, either by express waiver or by acquiescence in a waiver undertaken on his behalf by counsel. Accordingly, the right cannot be waived *in its entirety* by counsel over the objection of the accused by entering into stipulations which, in the circumstances of the particular case, are tantamount to a plea of guilty." (*In re Mosley* (1970) 1 Cal.3d 913, 924 [83 Cal.Rptr. 809, 464 P.2d 473].)

 Applying the foregoing principles to the case before us we conclude that counsels' stipulation to submit the case on the transcript of the preliminary examination, acquiesced in by both defendants was, in the circumstances of this case, tantamount to a waiver of the right of confrontation.

The attempted appeals from the orders denying motions for a new trial are dismissed. The judgments are affirmed.

Stephens, Acting P. J., and Aiso, J., concurred.