[Crim. No. 37738. Second Dist., Div. Five. Apr. 27, 1982.]

In re JESSIE L. et al., Persons Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
JESSIE L. et al., Defendants and Appellants.

COUNSEL

Douglas B. Finlayson and Jolene Larimore, under appointments by the Court of Appeal, for Defendants and Appellants.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Marc E. Turchin and Sharlene A. Honnaka, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

ASHBY, J.—In petitions filed pursuant to Welfare and Institutions Code section 602, appellants Jessie L. and Edward J. were charged in six counts with murder, attempted robbery, assault with a deadly weapon and robbery. After denial of their various pretrial motions, there was a plea bargain in which it was stipulated that the cause be submitted on the police reports, that appellants would be found to have committed second degree murder although the evidence would support a finding of first degree murder, and that the remaining counts would be dismissed. Upon the finding of murder and the dismissal of other counts in accordance with the understanding, appellants were committed to the Youth Authority. They appeal.

Since the issues on appeal relate primarily to the pretrial motions, only a brief summary of the circumstances of the crimes is necessary. On the evening of January 29, 1980, appellants and their two juvenile companions, Barry M. and David C., smoked PCP, acquired a sawed-off rifle and looked around their Long Beach neighborhood for someone to rob. They encountered Fredrick Cruz Saldana who was emptying his trash. David C. pointed the rifle at him and demanded money. When

Mr. Saldana replied loudly that he did not have any, several of his relatives came out, and David C. fired the rifle at Daniel Saldana Corona, striking him in the ankle. The young men then went to Seventh and Almond near the Alpha Beta market and hid in the bushes looking for another victim. As two boys, William Steele and Patrick Laverly, left the market, Barry M. stepped out of the bushes and pointed the rifle at them, demanding their money. When William Steele responded that they had no money, Barry M. fired the gun into Steele's chest, killing him. The robbers fled together. They were all arrested on February 1, 1980, and made incriminating statements to the police.

Appellants raise numerous contentions. They both contend they were arrested without probable cause and also that the murder weapon was unlawfully seized. Edward urges additionally that the prosecution failed to comply with a discovery order, that he was unlawfully arrested at his home without a warrant, that his statement to the police was involuntary, that the procedure of submitting on the police reports was improper, that the evidence is insufficient to show he aided and abetted the attempted robberies, that the felony-murder rule should be abolished, and that the court abused its discretion in committing him to the Youth Authority. We affirm, finding no merit to these contentions.

### PROBABLE CAUSE TO ARREST BASED IN PART ON INFORMATION FROM DAVID C.

Under the authority of a juvenile court arrest warrant for grand theft auto, the police arrested David C. at his home shortly after 5 a.m. on February 1, 1980. David was taken immediately to the police station where he was interviewed by Officer Miller for about an hour beginning at 5:25 a.m. He made statements implicating himself, appellants and Barry M. in the crimes. He informed the officer of the residences where appellants lived. The officers went there and arrested appellants. Appellants contend (1) that the information from David C. should have been excluded because David was unlawfully detained at the police station; (2) that the information from David C. should have been excluded on grounds of a failure by the prosecution to comply fully with a defense discovery order; and (3) that even if not excluded the information from David C. was insufficient to provide probable cause for appellants' arrest. The result, appellants contend, is that their arrests were illegal and that their own subsequent statements to police should be suppressed as products of such illegality.

■ Edward contends that David C. was unlawfully interrogated by Officer Miller because under the juvenile court arrest warrant David should have been taken to juvenile hall instead of to the police station. The warrant was not placed in evidence; there was no evidence that the warrant required that David be taken *immediately* to juvenile hall. (Cf. Pen. Code, § 814; Welf. & Inst. Code, § 626.) The interrogation began within 20 minutes of his arrest and lasted for 1 hour, a minimal delay. Even assuming, however, that this was an unnecessary delay within the meaning of Welfare and Institutions Code section 626, such a delay would not render David's statement inadmissible. The only question is whether David's statement was voluntarily made, and the delay in taking him to a juvenile probation officer is only one factor to be considered. (*People v. Harris* (1981) 28 Cal.3d 935, 953-954 [171 Cal.Rptr. 679, 623 P.2d 240]; *People v. Thompson* (1980) 27 Cal.3d 303, 329-330 [165 Cal.Rptr. 289, 611 P.2d 883]; *In re Michael E.* (1975) 112 Cal.App.3d 74, 79-80 [123 Cal.Rptr. 103, 538 P.2d 231].)

■ Indeed, appellant has no standing to contest the legality of David's interrogation unless he can show that David's statement was actually *coerced.* (*People v. Varnum* (1967) 66 Cal.2d 808, 812-813 [59 Cal. Rptr. 108, 427 P.2d 772].) Appellant fails to make such showing. The only evidence at the hearing was that David C. was advised of and waived his constitutional rights and voluntarily made his statement to the police. The delay was not shown to be a coercive factor rendering the statement involuntary.

■ Edward next claims that the prosecution did not give timely discovery to the defense concerning the information from David C., and that therefore the testimony supporting probable cause to arrest appellants should have been suppressed.

David C. told the police about Barry M. by name but he did not know appellants' names. He knew one of the appellants by nickname (Spooty) and he knew where both appellants lived. He told Officer Miller that Spooty lived with Barry in an identified apartment building on Cerritos, in the last apartment on the left, and that the other suspect lived in the green house next door to that apartment building on the north. He drew a rough sketch of the location for Officer Miller. Officer Miller discussed this information with Officer Castillo, the patrolman whose beat included that neighborhood. Officer Castillo was familiar with the residents at both of those locations. He knew that appellant Jessie L. was nicknamed "Spooty" and lived at the apartment in question, and that appellant Edward J. lived in the house.

However, the police report by Officer Miller of his interview with David C., which was provided initially to the defense on February 22, 1980, did not contain the information that David had identified one suspect as Spooty and had pointed out the residences of both. The report simply indicated that David had implicated Barry M. and two friends, all of whom were male Negroes.

When this question was drawn to his attention by the prosecutor, Officer Miller reviewed his report and realized it was incomplete. He still remembered the interview with David C. and he prepared a supplemental report which was provided to the defense on March 18, 1980, the day before the first day of pretrial hearings. The reason he did not put this information in his original report was that he "just screwed up, that's all." At the time he wrote his original report he erroneously thought such information was not necessary. "[Y]ou could go on for three days dictating stuff . . . ." After dictating his report, he had disposed of his handwritten notes of the interview. As for the map, "It was just a rough sketch. I knew where he was talking about, 9th and Cerritos, and I wanted to be sure that we went to the right houses. He drew it out on a piece of paper where it was." When the arrests were made, Officer Miller threw away the map, figuring it was of no use anymore, and that the addresses would be noted in the arrest reports.

The trial court found that appellants were not prejudiced by the delayed discovery, since the supplemental report was eventually provided the defense, and that a continuance would be adequate to enable appellants to meet the officer's testimony. Both in denying a motion to dismiss and in ultimately denying all the pretrial motions, the court indicated that the officer did not wilfully suppress evidence, that the court understood how the mistake could have happened, and that the court was satisfied that the defense had not been prejudiced and that the truth came out.

The trial court correctly concluded that the delayed discovery did not justify dismissal or other sanction. Where there has been a failure of discovery the normal remedy is not dismissal or the suppression of evidence, but a continuance to enable the defense to meet the new evidence. (*People* v. *Reyes* (1974) 12 Cal.3d 486, 501-502 [116 Cal.Rptr. 217, 526 P.2d 225]; *People* v. *McGowan* (1980) 105 Cal.App.3d 997, 1002 [166 Cal.Rptr. 725].) Here appellant received the supplemental report, the trial court offered a continuance, and appellant had ample opportunity to cross-examine Officer Miller about the new evidence.

(*People* v. *McGowan, supra.*) It is appellant's burden to demonstrate that he was prejudiced by the delayed discovery, and he has failed to satisfy that burden. His argument that had he known about the details of David C.'s statement earlier he could have prepared a better defense is highly speculative. (*People* v. *Reyes, supra*, at p. 502.)[1]

■ With regard to the map and rough notes, appellant contends they were material evidence which should have been preserved regardless of the lack of bad faith in their destruction, citing *People* v. *Hitch* (1974) 12 Cal.3d 641, 650 [117 Cal.Rptr. 9, 527 P.2d 361]. We disagree. The California cases which have considered similar issues involving rough notes have concluded that neither *Hitch* nor the Constitution require police officers to act like pack rats, saving every scrap of paper generated in an investigation. (*In re Gary G.* (1981) 115 Cal.App.3d 629, 939-646 [171 Cal.Rptr. 531]; *People* v. *Torres* (1979) 19 Cal. App.3d 724, 731 [157 Cal.Rptr. 560]; *People* v. *Dickerson* (1969) 270 Cal.App.2d 352, 359-360 [75 Cal.Rptr. 828]. See *People* v. *Murtishaw* (1981) 29 Cal.3d 733, 755 [175 Cal.Rptr. 738, 631 P.2d 446] [not deciding issue].) The routine destruction of the officer's handwritten notes and the map did not call for sanctions under *Hitch*.

■ Appellants both contend that even if the information from David C. is not excluded, it was insufficient to provide probable cause for appellants' arrest. They contend that David's statement to the police should not have been considered reliable because he was in custody for the same crimes and therefore might have been motivated to name other persons to secure leniency for himself. (See *Pollock* v. *Superior Court* (1969) 272 Cal.App.2d 548, 552 [77 Cal.Rptr. 565]; *People* v. *Shipe* (1975) 49 Cal.App.3d 343, 354 [122 Cal.Rptr. 701].) On the other hand, the People point out that David's statement implicating himself in murder, as well as his admission that he himself fired the rifle in the Saldana incident, was a declaration against penal interests and therefore presumptively reliable. (See, e.g., *People* v. *Tillery* (1979) 99 Cal.App.3d 975, 977 [160 Cal.Rptr. 650]; *People* v. *McFadden* (1970) 4 Cal.App.3d 672, 688 [84 Cal.Rptr. 675].) Both sides agree that the information from David would be sufficient if it was corroborated by independent investigation. (*Pollock* v. *Superior Court*,

---

[1]Appellant points out that when David C. was called as a witness at the hearing he refused to testify on grounds of self-incrimination. However, there is no reason to believe David would have been any more willing to talk to appellant's counsel a month earlier, since he too was charged with the crimes. The map and the handwritten rough notes of the interview where unavailable in any event after February 2.

*supra*; *People v. McFadden, supra*.) Such corroborating information need not by itself amount to probable cause for arrest. The basic question "is not whether the information obtained by the officers emanated from a reliable source, but whether the officers could reasonably rely upon that information under the circumstances." (*People v. McFadden, supra*, at p. 689.)

David's description of the crimes was consistent with the information the police had from witnesses. His description of the race and age of the four suspects was also consistent with information from witnesses. Appellants emphasize that David was in custody, but the police also had information that David had made a similar statement when he was not in custody. (*Ming v. Superior Court* (1970) 13 Cal.App.3d 206, 213-214 [91 Cal.Rptr. 477].) The police had interviewed a James Araky, David's stepbrother, who related that David had told him all about the murder near the market, including the number and race of the perpetrators and victims, the hiding in the bushes, and the shooting of the victim when he replied he had no money. Under all the circumstances the police could reasonably rely upon the information from David C. (*People v. McFadden, supra*, 4 Cal.App.3d 672.)

## Suppression of Murder Weapon

■ The police were led to the murder weapon by Jessie L.'s stepbrother, Antonio T., who was not himself a suspect. Appellants nevertheless contend that the weapon should have been suppressed on the ground that Antonio was subjected to custodial interrogation and should have been advised of his *Miranda* rights. There is no merit to this contention. Appellants have no standing to assert Antonio's *Miranda* rights. (*People v. Varnum, supra*, 66 Cal.2d 808, 812-813.) Appellants would have standing to contest seizure of the rifle only if they could show that Antonio's cooperation was produced by "physically and psychologically coercive tactics condemned by due process." (*Id.*, at p. 813.) They make no such showing.

The police found Antonio present when they went to appellant Jessie L.'s home to arrest Barry M. and Jessie L. Antonio was not a suspect; the police had no information against him. Antonio told Officer Collett that Jessie had brought a weapon home on the night of January 30, a sawed-off .22 rifle, and he agreed to take the police to it. The police asked Antonio if he would come down to the station and he agreed. According to Officer Collett, Antonio was free to leave. The police were

interested in the gun, not him. When Antonio made some conflicting statements at the station, Officer Collett told him he did not think Antonio was telling the truth and that he might be an accessory, but nevertheless Antonio was still free to leave. Shortly thereafter Antonio took the police to another residence where the gun was found. This record amply supports the trial court's finding that Antonio voluntarily cooperated with the police. Any conflict in the testimony of Officer Collett and Antonio was resolved in favor of the prosecution. (*People v. Lawler* (1973) 9 Cal.3d 156, 160 [107 Cal.Rptr. 13, 507 P.2d 621].)

### ARREST OF EDWARD WITHOUT A WARRANT

■ Edward contends that he was arrested at his home without a warrant in violation of *People v. Ramey* (1976) 16 Cal.3d 263 [127 Cal.Rptr. 629, 545 P.2d 1333]. He argues that his subsequent statement at the police station should have been suppressed as a product of an illegal arrest.

The People contend there were exigent circumstances posing a danger of flight or destruction of evidence which excused obtaining a warrant. (*People v. Ramey, supra*, at pp. 275-276.) We agree.

The police did not acquire sufficient information to arrest Edward until two things had happened: (1) David C. made his statement, not identifying Edward by name or nickname, but by address and (2) Officer Miller consulted with Officer Castillo, the patrolman whose beat included that neighborhood, and Officer Castillo identified Edward as the person who lived at that residence. David C. did not complete his statement until 6:30 a.m. on the morning of February 1. Officer Castillo was consulted between 8 and 8:30 a.m. A number of officers were gathered together and they left the police station between 9 and 9:30. They went first to Jessie L.'s apartment, where they expected to find Barry M. and Jessie. They were at that location about 20 minutes. They then went next door to arrest Edward.

The record supports the trial court's finding that exigent circumstances excused obtaining a *Ramey* warrant. David C. was in custody and had made his statement to police. He had a right to make two phone calls. (Welf. & Inst. Code, § 627, subd. (b).) The information against Edward did not ripen into probable cause, however, until normal business hours when the regular patrolman for that neighborhood could be consulted. The police could reasonably conclude that there was

no time to get a warrant and that the remaining suspects must be promptly arrested because they might flee or destroy evidence upon word getting out that David C. was in custody and had made statements to the police. Immediate flight was a reasonable possibility in light of the seriousness of the crime involved, murder. The police did not idly sit by during a period in which a warrant could have been obtained, but promptly gathered together a number of officers and went to the locations involved. There was no violation of *Ramey*.

Even assuming, however, that there were insufficient exigent circumstances and that *Ramey* was violated by Edward's arrest without a warrant, that would not render inadmissible Edward's subsequent statements to the police at the station after advice and waiver of his constitutional rights. Unlike *Ramey*, this is not a case where the defendant seeks to suppress evidence seized at the home in connection with the warrantless arrest. (*In re Reginald B.* (1977) 71 Cal.App.3d 398, 403 [139 Cal.Rptr. 465].) A technical violation of *Ramey* would not necessarily result in suppression of a subsequent statement to police. (*In re Reginald B., supra*, at pp. 403-404.) That violation, including its purpose and flagrancy, is simply a factor to be considered in determining whether a subsequent statement was a product of the suspect's free will in the totality of the circumstances. (*Id.*; *Brown* v. *Illinois* (1975) 422 U.S. 590, 603 [45 L.Ed.2d 416, 426-427, 95 S.Ct. 2254].) Other important factors include the suspect's waiver of his constitutional rights prior to questioning, the proximity of the arrest to the giving of statements, and intervening circumstances. (*Brown* v. *Illinois, supra*.) In this case, even if it were assumed that exigent circumstances had not been proved, there was no outrageous police conduct, and, as in *Reginald B., supra*, there were no circumstances about the arrest itself in Edward's backyard which rendered the arrest so fraught with illegality and coerciveness that it would taint a subsequent statement which ensued. Edward's statement to the police was shown to be voluntary (see *infra*). The arrest without a warrant did not render it inadmissible.

## VOLUNTARINESS OF EDWARD'S STATEMENT TO THE POLICE

In custody at the police station, Edward was advised of and waived his *Miranda* rights and made a statement to the police. He contends his statement should be suppressed on the grounds that (1) he was not advised that he could speak to a parent prior to any questioning and (2) in the totality of circumstances his statement was not voluntary.

■ There is no requirement that a minor be advised of and waive the opportunity to speak to a parent or to have a parent present during police questioning. (*People* v. *Lara* (1967) 67 Cal.2d 365, 378-379, 383 [62 Cal.Rptr. 586, 432 P.2d 202]; *In re Dennis M.* (1969) 70 Cal.2d 444, 462-463 [75 Cal.Rptr. 1, 450 P.2d 296]; *In re Anthony J.* (1980) 107 Cal.App.3d 962, 974 [166 Cal.Rptr. 238]. See *People* v. *Davis* (1981) 29 Cal.3d 814, 826 [176 Cal.Rptr. 521, 633 P.2d 186].) Edward's mother was present at the home when he was taken into custody. There is no evidence that she desired to speak to him, and no evidence that he ever indicated a desire to speak to her. (*People* v. *Davis, supra*; *In re Anthony J., supra*.) The facts were otherwise in the cases cited by Edward. (*People* v. *Burton* (1971) 6 Cal.3d 375, 381 [99 Cal.Rptr. 1, 491 P.2d 793] [minor asked to see his parents]; *In re Patrick W.* (1980) 104 Cal.App.3d 615, 617 [163 Cal.Rptr. 848] [minor's grandparents sought to speak to him]; cf. *Fare* v. *Michael C.* (1979) 442 U.S. 707, 725 [61 L.Ed.2d 197, 212-213, 99 S.Ct. 2560].)

■ Edward also contends that his statement to the police was involuntary in the totality of the circumstances. A minor has the capacity to make a voluntary confession. The admissibility of such a statement depends not upon his age alone but a combination of that factor with other circumstances such as his intelligence, education, experience, and ability to comprehend the meaning and effect of his statement. (*People* v. *Lara, supra*, 67 Cal.2d 365, 383; *Fare* v. *Michael C., supra*, 442 U.S. 707, 725; *In re Anthony J., supra*, 107 Cal.App.3d 962, 971-972.)

Edward was 14 years old. He was advised of his *Miranda* rights and stated that he understood those rights and wished to talk. Aside from the standard *Miranda* advisement, Officer Nelson discussed with Edward a special questionnaire which was used by the police to assure that juveniles understand their legal rights. Appellant's answers on this form indicated that he understood his rights. Edward again stated that he wanted to talk. No promises were made to him. At no time did appellant request a lawyer, a parent, a probation officer, or close relative to be present.

Appellant's age of 14 and his separation from his mother did not preclude a finding his statement was voluntary. (*People* v. *Lara, supra*, 67 Cal.2d at pp. 383-384.) Appellant's claim that the interrogation followed an illegal arrest on *Ramey* grounds is without merit. (See *ante.*) Reviewing the whole record of the voluntariness hearing (*People* v. *Ji-*

*minez* (1978) 21 Cal.3d 595, 609 [147 Cal.Rptr. 172, 580 P.2d 672]), we conclude the trial court's finding of voluntariness should be upheld.

Edward also refers to certain evidence which was received after the trial court had ruled on the motion to suppress, namely, the police report of Edward's interrogation and the diagnostic study and probation officer's report for purposes of sentencing. Even assuming that this subsequent evidence may be considered (cf. *People* v. *Sanchez* (1969) 70 Cal.2d 562, 573, fn. 13 [75 Cal.Rptr. 642, 451 P.2d 74]; *Blackburn* v. *Alabama* (1960) 361 U.S. 199, 209-211 [4 L.Ed.2d 242, 249-251, 80 S.Ct. 274]; *People* v. *Lindsey* (1972) 27 Cal.App.3d 622, 632 [103 Cal.Rptr. 755]), it does not compel a contrary conclusion. Appellant contends that he was "functioning below his age level." This apparently refers to the tests given for the diagnostic study, which showed that appellant was in the ninth grade and had achieved between the fifth and seventh grade levels on basic school skills. However, his I.Q. test was 89 and he was described as "of average intellectual potential" and "average intelligence." There was no evidence of psychosis or brain damage. Appellant asserts that he lacked prior experience in dealing with the police, but the probation report showed that he had a prior arrest for arson. The police report of the interrogation confirmed rather than detracted from the finding that appellant understood his rights. When the officer first started to read the *Miranda* rights, appellant interrupted saying, "You don't have to do that. I already know them." Nevertheless, the officer completed the reading of the *Miranda* rights and the juvenile questionnaire. The report indicated that during the interrogation appellant appeared very calm and showed no emotion regarding the murder, stating, "It just wasn't necessary." Appellant's argument that he probably did not understand that by admitting involvement in the robbery he was implicating himself in murder, is based on speculation. Edward's statement was properly admitted into evidence.

### SUBMISSION ON POLICE REPORTS

■ Edward contends that he was deprived of due process and of the effective assistance of counsel when his attorney agreed that the cause be submitted on the police reports. There is no merit to this contention. The submission was part of a plea bargain which eliminated the possibility of a finding of first degree murder and which preserved numerous issues for appeal. At the time of this trial there was no provision in Juvenile Court Law analogous to Penal Code section 1538.5, subdivision (m), which would permit a minor to admit the allegations of the

petition while preserving the right to contest search and seizure issues on appeal. (*In re David G.* (1979) 93 Cal.App.3d 247, 252-255 [155 Cal.Rptr. 500].)[2]

Appellant contends that the police reports contained information which would be inadmissible in a normal trial, such as appellant's prior record, gang associations, and confessions of coparticipants implicating Edward. However, submitting on the reports was an alternative to expressly admitting guilt by admitting the allegations of the petition, and the submission had the additional advantage of preserving numerous issues for appeal. (*Bunnell* v. *Superior Court* (1975) 13 Cal.3d 592, 602, fn. 4, 605 [119 Cal.Rptr. 302, 531 P.2d 1086].) Counsel made a tactical choice which appears amply justified by the record, and appellant, who personally agreed to the procedure, is in no position to complain. (See *People* v. *Valdez* (1947) 82 Cal.App.2d 744, 751 [187 P.2d 74]; *Bunnell* v. *Superior Court, supra*; *People* v. *Pope* (1979) 23 Cal.3d 412, 426 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].)

### SUFFICIENCY OF EVIDENCE AGAINST EDWARD

Edward contends that the evidence is insufficient to show that he aided and abetted the robbery which resulted in the death of William Steele. He contends that in his statements to the police he maintained throughout that he was merely present "to see what was happening," and that there is no other evidence from which it may be inferred that he aided the robbers with knowledge of their wrongful purpose. There is no merit to this contention. Whether appellant aided and abetted the robbery is a question of fact, and on appeal all conflicts in the evidence and reasonable inferences must be resolved in favor of the judgment. (*In re Lynette G.* (1976) 54 Cal.App.3d 1087, 1094 [126 Cal.Rptr. 898]. See *People* v. *Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738].) Among the factors which may be considered in determining aiding and abetting are: presence at the scene of the crime, companionship, and conduct before and after the crime, including flight. (*In re Lynette G., supra*, at pp. 1094-1095; *People* v. *McDaniels* (1980) 107 Cal.App.3d 898, 904 [166 Cal. Rptr. 12].)

In both the Saldana and the Steele incidents, the robbery victims reported that there were four suspects, who fled together. Contrary

---

2The Legislature subsequently amended the Juvenile Court Law to provide such a procedure. (Welf. & Inst. Code, §§ 700.1, 800.)

to appellant's contention, his statement to the police did not consistently deny an intent to rob. With regard to a conversation among the participants prior to the Saldana incident, Edward told Officer Nelson that "[a]s they discussed it in the vehicle, everyone decided to go along." After stopping to get a gun, "The four (4) juveniles then started walking on 6th Street to 'find someone to rob.'" Although claiming that he stood several feet away from the others, Edward admitted fleeing with the others after the Saldana incident, then "walking around again, looking for someone to rob." When they got to the Alpha Beta store, Edward claimed that the other three hid in the bushes while he remained on the sidewalk 10 feet away, but he admitted speaking to William Steele and Patrick Laverly. He claimed he thought the others were looking for some old people to rob, and was surprised when Barry M. stepped out on the sidewalk and pointed the rifle at these two juvenile victims. But appellant admitted fleeing with the others after the murder.

Thus appellant admittedly knew what the others were doing. Had he wished to dissociate himself from their purposes, he would not have gone along with them after observing the Saldana attempted robbery. His admissions and his conduct before and after the crimes amply contradict the claim that he was present merely to see what would happen. (*In re Lynette G., supra*, 54 Cal.App.3d 1087; *People v. McDaniels, supra*, 107 Cal.App.3d 898.)

Appellant also invites us to abolish the felony-murder rule because it violates "the principle of individual moral culpability." This we cannot do. In California the felony-murder rule is statutory (Pen. Code, § 189) and represents a considered judgment by the Legislature that the purpose to deter felons from killing outweighs the normal legislative policy of examining the individual state of mind of each person causing an unlawful killing. (*People v. Burton, supra*, 6 Cal.3d 375, 388.)

COMMITMENT OF EDWARD TO THE YOUTH AUTHORITY

 . Edward contends that the trial court abused its discretion in committing him to the Youth Authority, since Edward was only 14 years old and had no prior juvenile court adjudications. We find no abuse of discretion. (See *In re John H.* (1978) 21 Cal.3d 18, 27 [145 Cal.Rptr. 357, 577 P.2d 177]; *In re Gregory S.* (1978) 85 Cal.App.3d 206, 212-213 [149 Cal.Rptr. 216].) The probation officer reported that appellant was heavily involved in gang activities. The probation officer

viewed appellant as dangerous to the community and recommended that appellant be committed to the Youth Authority. "It is felt that the minor requires the longer term and more secure setting provided by the California Youth Authority. Further, that they will be able to provide a wider range of resources as the minor can benefit from vocational training." The court first obtained a diagnostic study from the Youth Authority. The diagnostic study similarly recommended "[p]lacement in a maximum security, highly structured setting similar to that offered by the Youth Authority." The report reviewed appellant's gang associations, "his own developing violence capacity" and his willing participation in "a group that roamed around victimizing innocent people, casually and coldly accosting them for purposes of robbery until suddenly one coldly killed another teenager.... [¶] .... [¶] In consideration of the serious nature of the offenses in which [he] was involved, albeit as a follower rather than an instigator, we feel removal from the community to a structured setting is in order. Again, he chose to continue on after the first incident, has continued not to fully assume responsibility for his part, and must be regarded as something of a danger in the community by virtue of his willing association with delinquent peers who robbed, intimidated, and assaulted innocent victims. We feel that a relatively short county level program would not be sufficient to deal with this young man." The trial court properly gave weight to the conclusion of the Youth Authority experts (*People* v. *Carl B.* (1979) 24 Cal.3d 212, 218-219 [155 Cal.Rptr. 189, 594 P.2d 14]) and was of the opinion that appellant would be benefited by the psychiatric and educational facilities of the Youth Authority.

The judgments are affirmed.

Stephens, Acting P. J., and Hastings, J., concurred.