[Crim. No. 34741. Second Dist., Div. One. Dec. 26, 1979.]

THE PEOPLE, Plaintiff and Appellant, v.
CLIFTON HUTCHINS et al., Defendants and Respondents.

COUNSEL

John K. Van de Kamp, District Attorney, Donald J. Kaplan and Daniel L. Bershin, Deputy District Attorneys, for Plaintiff and Appellant.

No appearance for Defendants and Respondents.

OPINION

LILLIE, Acting P. J.—Wynn, Walker, Hutchins and Taylor were charged with conspiracy to transport and sell PCP, and with transportation and sale of PCP; Hutchins and Taylor alone were charged with possession for sale of PCP. On motion of Hutchins and Taylor pursuant to section 1538.5, Penal Code, the trial court ordered suppressed evidence recovered as a result of their arrest. The People appeal from order suppressing evidence and dismissing the cause as to Hutchins and Taylor.[1]

On October 12, Deputy Carpenter, acting in an undercover capacity in Antelope Valley, received a call from defendant Wynn[2] who offered to sell him 20 ounces of leaf PCP for $2,000 but said they would have to meet with another person to finalize the deal; he told Wynn to contact the person.

The next day (Oct. 13) at 11:30 a.m. Wynn called Deputy Carpenter and said that the people selling the 20 ounces of leaf PCP wanted to see the money but a photograph of the money would suffice. Deputy Casita was then sent to a 7-Eleven store parking lot with $2,000. At noon Deputy Carpenter picked up Wynn and drove to 7-Eleven and entered Deputy Casita's vehicle where Deputy Carpenter took three Polaroid

---

[1]Neither Michael Wynn nor Shirley Walker is involved in this appeal. Originally, the trial court granted Shirley's section 1538.5 motion but did not dismiss the cause as to her; subsequently on the People's petition, a peremptory writ of mandate issued out of this court commanding the trial court to vacate the order granting Shirley's motion to suppress and enter an order denying the same.

[2]In the reporter's transcript on the motion Wynn is referred to as "Winn."

pictures of the $2,000 and gave them to Wynn. About 8:30 p.m. Wynn called Deputy Carpenter and said the PCP was "here," they were ready to "do the deal," the people they were buying from were coming to his house and he would call "as soon as they were ready to go." At 1:30 a.m. Wynn called Deputy Carpenter and said that because "the people with the narcotics" had to take a friend to the hospital, the deal would be delayed to the next morning.

On October 14 at 10 a.m. Wynn called Deputy Carpenter and said he could sell or was with someone who could sell him 16 ounces of liquid PCP for $2,000, and that the PCP was coming from Pasadena; Deputy Carpenter then heard Wynn yell in the background, "Shirley come here and cover the phone"; they conversed and arranged to meet at Sambo's. Shortly thereafter, Wynn called Deputy Carpenter and made arrangements for him (Carpenter) to, and he did pick him up and meet Shirley at an intersection; defendant Shirley Walker told him she was not the one who had possession of the PCP, and that the 16 ounces of liquid PCP for which the price was $2,000 was in possession of someone in Pasadena, and they would have to go to Pasadena to get it and he would have to "front the money"; Deputy Carpenter told her he wanted the PCP but would not do the transaction that way whereupon Shirley made a call from a phone booth; Deputy Carpenter, about 6 feet away, saw Shirley dial a number, heard her say, "Hi, this is Shirley, I have to have Preacher's number," and saw her write something on the wall; Shirley then dialed a number and Carpenter heard her say, "Preacher, this is Shirley. He won't do the deal the way we want to do it"; at the conclusion of her conversation she told Deputy Carpenter they could "do the transaction that way" but it would be at Denny's; she would bring the PCP to him (Carpenter) and he would give her the money which she would take to her friend; Shirley left and Wynn showed him a paper on which he had copied down "Preacher's" phone number, and said they could deal directly with him.

At the station Deputy Carpenter called Wynn to confirm "Preacher's" number which he had memorized; through official channels he learned it was listed to defendant Clifton Hutchins at an address in Altadena. Deputy Carpenter advised Sergeant Wachsmuth, his superior who was familiar with the undercover operation, that the negotiations for the purchase of 16 ounces of PCP were progressing, Wynn had introduced him to Shirley who was involved in the negotiations, and he had the phone number of Hutchins in Pasadena. Deputy Wachsmuth commenced surveillance of Deputy Carpenter and Wynn.

At 1 p.m. Wynn called Deputy Carpenter and told him to pick up him and Shirley and they would go to Denny's where "Preacher's girl friend was going to do the transaction." Fifteen minutes later Wynn called back and advised Deputy Carpenter that Shirley contacted him and said the transaction would have to be done at the Villa Princessa off-ramp of the freeway; Deputy Carpenter refused. Fifteen minutes later Wynn again called Deputy Carpenter that Shirley said they would do the transaction at Denny's under his terms; he told Carpenter Shirley said he (Carpenter) was to pick them up, drive to Villa Princessa and drop her (Shirley) off, then he (Carpenter) would proceed to Denny's where she, "Preacher" and his girl friend would respond and do the transaction, and that the people were coming to Villa Princessa from Pasadena.

Deputy Carpenter advised Sergeant Wachsmuth that the transaction was supposed to go down at Denny's, someone was to deliver 16 ounces of PCP to Villa Princessa off-ramp, "Preacher" and his girl friend were supposed to be on Villa Princessa off-ramp, and to go there. Deputies Wachsmuth and Jensen arrived at Villa Princessa off-ramp at 2 p.m.; they observed a female Negro (defendant Hattie Ruth Taylor) standing at a stop sign looking up the southbound off-ramp, and a male Negro (defendant Clifton Hutchins) seated in the driver's seat of a Mazda parked under the overpass; they continued on Villa Princessa and stopped a quarter of a mile away; looking back they saw the Mazda, and Taylor at the stop sign still looking up the ramp; the area around the off-ramp was open, surrounded by desert; they circled around, re-entered the freeway and as they crossed the Villa Princessa overramp, observed the Mazda but no one near it; making a U-turn in the middle of the freeway they observed Taylor still standing at the stop sign; they waited in an area away from the freeway.

Deputy Carpenter picked up Wynn; at Shirley's residence he was advised she was en route to Wynn's house; too much time had elapsed and he feared if he returned for Shirley that those waiting at Villa Princessa would leave; he did not go back to Wynn's house but effected the arrest of Wynn, recovering from his person the Polaroid photo of $2,000 he had taken the day before at 7-Eleven.

Immediately Deputy Carpenter advised Sergeant Wachsmuth via radio that he had arrested Wynn, and told him to proceed to Villa Princessa off-ramp, investigate and take whatever action he deemed ap-

propriate, the deal was becoming complicated, "the point in time" had passed as a result of which he had to arrest Wynn. Sergeant Wachsmuth proceeded to the freeway and exited at Villa Princessa; seated in the Mazda were Hutchins and Taylor; he ordered them to exit, and as they got out of the car, he detected the odor of PCP; Taylor and Hutchins came to the front of the car where they identified themselves and were "booked"; he walked to the open right passenger door of the vehicle and from outside could smell the odor of PCP; he then opened the right rear passenger door and advanced toward the point where he detected the strongest odor but found nothing; Hutchins and Taylor were under arrest at that time.[3]

This court is bound by the trial court's determination, based upon what it perceived as a conflict in the testimony of Sergeant Wachsmuth, that Wachsmuth arrested Hutchins and Taylor before he detected the odor of PCP. (*People* v. *Lawler,* 9 Cal.3d 156, 160 [107 Cal.Rptr. 13, 507 P.2d 621].) However, from the totality of the trial court's statements considered in the context of those of the prosecutor, we conclude that in all other respects the trial court accepted the testimony of Sergeant Wachsmuth; and that on the basis of the testimony of Deputies Carpenter and Wachsmuth it ruled as a matter of law that there was no probable cause to arrest Hutchins and Taylor. (See *People* v. *Superior Court (Quinn)* 83 Cal.App.3d 609, 617-618 [147 Cal.Rptr. 921].) Thus, we direct our attention to the issue of the validity of the arrest of Hutchins and Taylor.

■ The People contend, and we agree, that there was probable cause to arrest Hutchins and Taylor based upon the information supplied to Sergeant Wachsmuth by Deputy Carpenter and upon his own personal observations.[4]

■ A peace officer may arrest a person without a warrant "Whenever he has reasonable cause to believe that the person to be arrested has committed a felony, . . ." (§ 836, subd. 3, Pen. Code.) "'Reasonable cause' has been defined as 'that state of facts as would lead a man of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that the person is guilty of a crime.' [Cita-

---

[3]The transcript of the testimony taken on the motion does not reveal the evidence sought to be suppressed, but the reporter's transcript of the testimony taken at the preliminary hearing shows that Deputy Bourdon found 24 ounces of PCP in 4 bottles concealed under a rock and board near a fence 30 to 40 feet from the Mazda.

[4]We eliminate from our considerations all evidence relating to the detection of the odor of PCP.

tions.]" (*People v. Fein*, 4 Cal.3d 747, 752 [94 Cal.Rptr. 607, 484 P.2d 583].) No exact formula exists for determining probable cause and each case must be decided on the facts and circumstances presented to the officers at the time they were required to act. (*People v. Fein, supra*, 4 Cal.3d 747, 752; *People v. Terry* 2 Cal.3d 362, 393 [85 Cal.Rptr. 409, 466 P.2d 961].)

▮ Information was supplied by an informant, Wynn, to Deputy Carpenter who in turn relayed that information, its source and his own personal observations and activities to Sergeant Wachsmuth. ▮ An arrest may be made solely upon the basis of information received from a single reliable informant. (*People v. Cedeno*, 218 Cal.App.2d 213, 219 [32 Cal.Rptr. 246].) ▮ Wynn was the informant, but not in the sense he intentionally supplied information to a police officer; he was unaware of Deputy Carpenter's undercover capacity and all information he relayed to him was to facilitate a successful PCP transaction from which he hoped to profit. He was arrested for his participation in the illegal transaction and is one of the defendants herein. Wynn was a reliable informant, and he was known to Deputy Carpenter to be reliable, Carpenter having made sufficient observations concerning the details given to him by Wynn, and having personally involved himself with Wynn as a narcotic trafficker in an illegal transaction to establish Wynn's reliability. Deputy Carpenter in good faith believed him to be and indeed Wynn proved himself to be trustworthy concerning all details of the PCP transaction in which they were engaged. (*Dunn v. Municipal Court*, 220 Cal.App.2d 858, 870 [34 Cal.Rptr. 251].)

Wynn supplied the information to Deputy Carpenter believing him to be a narcotic trafficker, in an earnest and good faith attempt to sell him PCP for profit. Most of the information Wynn had given to him concerning Shirley and the modus operandi of the transaction involving Hutchins and Taylor from Pasadena who had possession of the PCP, were personally observed by Deputy Carpenter, giving credence to Wynn. But of greater significance is the fact that Wynn was part of the illegal transaction, setting it up and accompanying Deputy Carpenter "to the deal," subjecting himself to prosecution for several offenses including conspiracy. Thus, his statements contained an "internal guaranty of reliability" (*Skelton v. Superior Court*, 1 Cal.3d 144, 154, fn. 7 [81 Cal.Rptr. 613, 460 P.2d 485]; *People v. Hall*, 42 Cal.App.3d 817, 823 [117 Cal.Rptr. 228]; *In re Golia*, 16 Cal.App.3d 775, 782 [94 Cal.Rptr. 323]; *People v. McFadden*, 4 Cal.App.3d 672, 688 [84

Cal.Rptr. 675]) Wynn could be deemed a reliable informant without further corroboration by virtue of his own declarations against penal interest made while attempting to participate in an illegal transaction, and could be relied upon by Deputy Carpenter without independent corroboration to establish probable cause. Deputy Carpenter was entirely reasonable in believing Wynn's information to be true, acting on it and relaying it to Sergeant Wachsmuth. (*Ming* v. *Superior Court,* 13 Cal.App.3d 206, 214-215 [91 Cal.Rptr. 477].) Moreover, "where the declarant is or may be the subject of police inquiry and makes a statement potentially adverse to his interests, that statement, when reported by a reliable informant, satisfies both prongs [one of which is personal knowledge] of the *Aguilar* test." (*People* v. *Mardian*, 47 Cal.App.3d 16, 31 [121 Cal.Rptr. 269].)

The information conveyed to Deputy Carpenter by Wynn, and Wynn's own conduct and statements in the negotiations, arrangements for and participation in the PCP transaction, established that Hutchins (Preacher) had in his possession 16 ounces of liquid PCP; Hutchins and his girl friend (Taylor), from Pasadena, would bring the PCP to and would be at the Villa Princessa off-ramp where Deputy Carpenter and Wynn were to deliver Shirley, then go to Denny's; Hutchins and Taylor with the help of Shirley would sell the PCP to Deputy Carpenter for $2,000 at Denny's after Shirley met with them at the off-ramp. All of this information as well as the source and the manner of obtaining it, was relayed through official channels to Sergeant Wachsmuth who was entitled to rely on it. (*People* v. *Estrada*, 234 Cal.App.2d 136, 152 [44 Cal.Rptr. 165, 11 A.L.R.3d 1307]; see also *Ming* v. *Superior Court*, 13 Cal.App.3d 206, 214-215 [91 Cal.Rptr.477].)

Sergeant Wachsmuth had the foregoing information in his possession when he proceeded to Villa Princessa off-ramp. It was a deserted area and for 40 minutes Hutchins and Taylor remained in their respective positions waiting, and no one else entered the area. Sergeant Wachsmuth observed taking place before his eyes the very events which Wynn had told Deputy Carpenter would occur. (*People* v. *Padilla*, 18 Cal. App.3d 433, 437 [95 Cal.Rptr. 661].) Thus having personally verified part of Wynn's story he was entitled to rely on the rest of it—that those persons at the off-ramp were awaiting the arrival of Shirley to sell PCP, and had the contraband with them (*People* v. *Chavez*, 275 Cal.App.2d 54, 56-57 [79 Cal.Rptr. 701]); he could reasonably conclude that Hutchins and Taylor waiting at the off-ramp were "Preacher" and his

girl friend. Thus he had probable cause to arrest them for transportation of PCP, possession for sale of PCP or in the alternative, an offer to sell PCP which had been made through Wynn and Shirley. (*Draper* v. *United States* (1959) 358 U.S. 307, 314 [3 L.Ed.2d 327, 332-333, 79 S.Ct. 329]; *People* v. *Shipstead*, 19 Cal.App.3d 58, 66-69 [96 Cal.Rptr. 513]; *People* v. *Padilla*, 18 Cal.App.3d 433, 435-437 [95 Cal.Rptr. 661]; *People* v. *Love*, 8 Cal.App.3d 23, 27-29 [87 Cal.Rptr. 123]; *People* v. *Richardson*, 6 Cal.App.3d 70, 74-75 [85 Cal.Rptr. 607].)

The order is reversed.

Hanson, J., and Kaufmann, J.,* concurred.

*Assigned by the Chairperson of the Judicial Council.