[Crim. No. 22765. Second Dist., Div. Five. Oct. 29, 1974.]

THE PEOPLE, Plaintiff and Respondent, v.
SHERRY HALL, Defendant and Appellant.

818

**Counsel**

G. Alfred Roensch, under appointment by the Court of Appeal, Michael J. Keady and George Gerasimos Benetatos for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, James H. Kline and Owen Lee Kwong, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

KAUS, P. J.—Defendant was one of 20 individuals named in a 29-count indictment. Defendant was charged in counts I and II of the indictment with conspiracy (Pen. Code, § 182, subd. 1), in counts XXVII and XXVIII with forgery (Pen. Code, § 470) and in count XXIX with forging the California state seal (Pen. Code, § 472). She pleaded not guilty. Motions under sections 995 and 1538.5 of the Penal Code were denied. Defendant withdrew her plea of not guilty and pleaded guilty to count XXVII. On motion of the People the remaining counts pending against defendant were dismissed. Proceedings were suspended. Defendant was placed on three years' probation on various terms and conditions, including 60 days in jail. She was credited with having already served two. of those days. Defendant was admitted to bail. Imposition of the remaining jail term was stayed pending appeal.

Defendant's section 1538.5 motion sought to suppress a handwriting exemplar on the theory that the police lacked probable cause to arrest her. On this appeal defendant contends that the motion was erroneously denied. (Pen. Code, § 1538.5, subd. (m).) Pursuant to stipulation, the motion to suppress was submitted on the grand jury transcript, plus additional testimony, following defendant's waiver of her right to confront witnesses for purposes of the motion.

Defendant was arrested on April 14, 1972, by Detective Bedford of the Beverly Hills Police Department. Bedford acted on the basis of the following information.

In October 1971, a Beverly Hills citizen sold a Mercedes automobile to a purchaser who paid for the car with a fictitious cashier's check. Bedford was the investigating officer on the case. The scheme seemed unique to Bedford and he began collecting teletypes from various law enforcement agencies regarding the forging of cashier's checks. One such teletype from the Los Angeles Police Department dated October 22, 1971, described a similar vehicle transaction and advised that two individuals, Marshall Duf-

field Hofflund and Richard Anthony Bivona,[1] had been arrested in connection therewith.

Another of the bulletins collected by Bedford was issued by the California Department of Justice. Dated December 1971, it read as follows:

" 'Several forgery rings are having success passing counterfeit cashier's checks in California. This is a new trend in forgery crimes.

" 'The scheme involves purchasing expensive automobiles from private parties and making payment with a counterfeit cashier's check.

" 'Prospective victims are contacted through classified ads the person who passes the counterfeit cashier's check often has an accomplice, usually a woman, introduced as his wife.

" 'The wealthy are selected because they normally have pink slips, certificate of ownership, in their possession. This is a necessary element in the transaction. In this way the thief can resell the car immediately to a third party.

" 'Once the car is resold the registration paperwork takes about a month to pass through the Department of Motor Vehicles before police can locate the car.

" 'The third party receiving the car is normally allowed to keep it. The insurance company ultimately assumes the loss.

" 'It is believed that [sic] as yet unidentified central printing plant is supplying different groups with counterfeit cashier's checks    .

" 'One group operating in the Bay Area has been using Bank of America and Wells Fargo Bank Cashier's Checks.

" 'A separate group operating in Southern California and the Bay Area has been using Union Bank and City National Bank Cashier's Checks.

" 'Pictures of members of both groups appear on the following pages.' "
Amongst the suspects named in this bulletin were Richard Issoglio[2] and Marshall Duffield Hofflund.

On December 16, 1971, Issoglio and Theodore Southwood[3] were arrested in Beverly Hills following an episode of erratic driving by Southwood. A .38 caliber revolver was found on the floor of the car. A holster was thrown from the car during the course of the police pursuit. Three blank

---

[1]Both of these individuals were named as codefendants in the indictment.

[2]Also named in the indictment.

[3]Another of the indicted codefendants.

Wells Fargo checks all bearing an identical serial number were recovered from the trunk of the car along with a check protector from which the serial number had been removed, a rifle, and $2,650 in cash which was under the floor mat of the trunk. Bedford became the investigating officer on this case also.

On January 3, 1972, Nancy Jo Lee, Clare Tipple and Darrel King[4] were arrested by Bedford following an attempt to purchase a diamond at Tibor jeweler's with a fictitious cashier's check. Another fictitious cashier's check made out to Tiffany's was found in the glove compartment of King's car. Issoglio's fingerprint was found on this check.

On March 10, 1972, Hofflund's apartment was searched, pursuant to a warrant, by Sergeant Buoncristiani of the Los Angeles Police Department. A quantity of cashier's checks were found in the search, along with 60 to 80 pounds of "safety paper" used for printing checks, and a receipt for the purchase of a check protector.[5] On March 23, 1973, Charles Bivona[6] was arrested at the Downey Coin Center after trying to purchase gold coins with a fictitious check for $22,548.75. Issoglio and Hofflund, who had been seated outside the coin shop in Bivona's car, were arrested by Buoncristiani.

Early in his investigation Bedford established a working relationship for the exchange of information with Buoncristiani and Sergeant Cameron, also of the Los Angeles Police Department. Bedford was in touch with these two officers on almost a daily basis from at least January 3, 1972, to the time of defendant's arrest. As a result of such contacts Bedford learned the details of the search of Hofflund's apartment and of the arrests which took place at the Downey Coin Center.

Bedford was present when Thomas Noonan was interviewed by Buoncristiani and Cameron.[7] Noonan had been identified as having passed certain fictitious cashier's checks and admitted such involvement. He identified Issoglio and Hofflund as the masterminds of the operation. He stated that Issoglio had previously been in partnership with Southwood, but that that relationship had broken up.

---

[4]Additional indicted codefendants.

[5]Hofflund had purchased a check protector on March 9, 1972, while under surveillance by the Los Angeles Police Department.

[6]Yet another indicted codefendant.

[7]Noonan was named in the indictment. The precise date of this interview does not appear in the record, but it was prior to March 23, 1972, the date of the Downey Coin Center arrests.

On April 14, 1972, James Culp[8] was arrested at Home Savings and Loan Association in Beverly Hills while attempting to open an account with a counterfeit cashier's check. Bedford interviewed Culp following his arrest. Culp stated that earlier that week he had met a girl named Sherry Hall at a bar in San Francisco and had driven to Los Angeles with her in her car. When they arrived in Los Angeles, Sherry introduced Culp to her boyfriend whom she identified as Rick. He proposed a scheme to Culp whereby Culp could earn $10,000 by depositing four cashier's checks in various savings and loan associations. Thereafter Rick introduced Culp to his partner whom he identified as Duffy. Culp identified a photograph of Issoglio as Rick and one of Hofflund as Duffy.

Duffy had Culp photographed at a booth in a dime store so that a fictitious driver's license could be prepared for him. On April 14, Culp was driven to American Savings and Loan in Beverly Hills by a teenager named Karl. Culp started into American Savings when Sherry came out the door, grabbed him and said, "You dummy. Those checks aren't inside yet." Culp returned to the car where Sherry signed four cashier's checks. Culp took one of the checks and a California driver's license and opened a savings account at American Savings. Culp then proceeded to Home Savings where he attempted to repeat the procedure before his arrest.

Culp described Sherry as a very attractive girl in her early twenties with long blond hair. He also provided Bedford with two telephone numbers for Rick and an apartment address. Bedford contacted the telephone company and learned that the telephone numbers Culp gave him were listed to a Lewis Issoglio on Willis Avenue. Bedford proceeded to that location and knocked on the door. It was opened by a young man later identified as Karl Lotito. Issoglio was inside, lying on a couch. Defendant was seated on the floor beside him. Defendant matched the description of Sherry provided by Culp. Bedford arrested both Issoglio and defendant.

■ Defendant asserts that Bedford lacked probable cause to arrest her because the only information he had tying her to the check forging ring came from Culp and Culp was an untested informant. ■ In order for an arrest based on information obtained from an informant to be valid it must appear that the informant spoke from personal knowledge and that the officer had some basis for concluding that the information was reliable. The test is not whether the informant was reliable, but whether, under the circumstances, the officer was reasonable in relying on the information he provided. (*People* v. *Lara,* 67 Cal.2d 365, 374-375 [62 Cal.Rptr. 586, 432 P.2d 202]; *People* v. *Balassy,* 30 Cal.App.3d 614, 620 [106 Cal.Rptr. 461]; *People* v. *McFadden,* 4 Cal.App.3d 672, 689 [84 Cal.Rptr. 675].)

[8]Another codefendant.

Thus, although Bedford had no information corroborating defendant's participation in criminal activities, the great wealth of information he had as to Issoglio's and Hofflund's deep involvement in the check counterfeiting ring, including his knowledge as to their modus operandi and the fact that they typically operated with a woman, obviously gave credence to Culp's story. Furthermore, Culp not only incriminated himself on the check forging count for which he was arrested, but also subjected himself to potential prosecution for conspiracy. His statements therefore contained an "internal guaranty of reliability." (*Skelton* v. *Superior Court,* 1 Cal.3d 144, 154, fn. 7 [81 Cal.Rptr. 613, 460 P.2d 485]; *In re Golia,* 16 Cal.App.3d 775, 782 [94 Cal.Rptr. 323]; *People* v. *McFadden, supra,* 4 Cal.App.3d 672, 688 [84 Cal.Rptr. 675].) Given all of the information Bedford had acquired in his lengthy investigation of the counterfeiting ring, he was entirely reasonable in believing Culp's information to be true and in acting upon it.

The judgment (order granting probation) is affirmed.

Stephens, J., and Ashby, J., concurred.

A petition for a rehearing was denied November 27, 1974, and appellant's petition for a hearing by the Supreme Court was denied December 26, 1974.