[Crim. No. 35491. Second Dist., Div. One. Jan. 23, 1981.]

THE PEOPLE, Plaintiff and Respondent, v.
MARY HELENE GARCIA, Defendant and Appellant.

COUNSEL

Paul Arthur Turner, under appointment by the Court of Appeal, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Gary R. Hahn and John R. Gorey, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

SPENCER, P. J.—

## INTRODUCTION

Defendant Mary Helene Garcia appeals from a judgment of conviction following trial by jury. Her pretrial motion to suppress evidence pursuant to Penal Code section 1538.5 was denied and defendant was found guilty of violation of Penal Code section 187, first degree murder, and violation of Penal Code section 211, robbery. Defendant was sentenced to state prison on the murder conviction for the term prescribed by law. Sentence on the robbery conviction was stayed.

## STATEMENT OF FACTS

On January 6, 1978, Mary Helene Garcia (appellant) met Thomas Empey (Empey) and Jerry Martin (Martin) at her apartment in Fort Worth, Texas. In her presence, Empey and Martin discussed plans to rob a local spa (Spa) and to steal a pickup truck owned by the manager, Robert Faust (Faust). She drove the men to the Spa and immediately proceeded to another location. Martin and Empey, wearing ski masks, entered armed with Martin's .32 caliber pistol. Empey seized a 12-gauge shotgun which they used together with Martin's pistol to steal some cash, a pellet gun and a single-shot shotgun. They abducted Faust and an employee, Richard Suominen (Suominen); took Faust's pickup truck and drove to an isolated spot where Empey shot and killed Faust. Their efforts to kill Suominen were thwarted by Suominen's escape. The surviving victim reported the crimes to the Fort Worth authorities.[1]

---

[1]Appellant has not been tried for the Fort Worth crimes. The facts set forth with respect to those offenses and the parties' flight from Fort Worth are included in that they are pertinent to issues raised on appeal in the instant case.

Martin and Empey returned to appellant's apartment and divided the proceeds of the robbery. Appellant arrived a short time later, and the two men told her of the events that occurred after she left them at the Spa. She accompanied them to an isolated area where they burned Faust's truck. They then drove to a location where Martin and Empey met with two women who knew of their involvement in the Spa robbery. She was present when they paid the potential informants for their silence. Upon their return to her apartment, Empey stored the stolen single-shot shotgun in a closet.

Armed with Martin's pistol and the stolen 12-gauge shotgun, the trio left Fort Worth in Martin's station wagon (registered to his estranged wife) and eventually arrived in Las Vegas. Enroute, when it appeared that they would be stopped by a state policeman, appellant removed the pistol from the glove compartment, at Martin's request, and placed it on the seat beside him. Sometime later, Martin told appellant and Empey that he would not be taken alive. He further suggested that they rob a gas station should they run short of funds.

After two days in Las Vegas, Empey surreptitiously left Martin and appellant and returned to Fort Worth. On January 10 or 11, 1978, he voluntarily surrendered to the authorities and made a full confession implicating his former companions.

Unaware of Empey's confession, Martin and appellant drove to California where Martin's station wagon ultimately broke down on a main thoroughfare in Santa Barbara. Their funds were exhausted and they abandoned the station wagon.

About 6 o'clock on the evening of January 15, 1978, Martin, accompanied by a woman described as having long black hair similar to that of appellant, in a white Volkswagen Rabbit (Rabbit) purchased gasoline in Santa Barbara. The Rabbit was the car that the victim in the instant case, William Knox (Knox), had driven to Santa Barbara.

Knox had checked out of a Santa Barbara motel on the morning of January 15th. Four days later his body was discovered in a roadside ravine in Santa Barbara. He had been shot repeatedly in the chest and abdomen with Martin's .32 caliber pistol.

On January 12, 1978, the Tarrant County Sheriff's Department obtained a search warrant for appellant's apartment and seized the

single-shot shotgun. Warrants of arrest were issued for Martin and appellant.

Several days later, the Fort Worth police became aware that appellant and Martin had returned to the area and Detective Goodwin (Goodwin), assisted by an informant (Wilson), formulated plans to effect Martin's arrest. By happenstance, Goodwin was in Wilson's home when Martin telephoned and made arrangements with Wilson for a "marijuana buy." Goodwin and another officer waited for Martin to arrive pursuant to the arrangements. Both officers had prior information from Empey that Martin and appellant were traveling armed.

Goodwin observed Martin and appellant as they arrived in the Rabbit. Following their entry into the Wilson residence, Goodwin arrested Martin. A search of Martin's person yielded a loaded .32 caliber pistol and another loaded clip. Simultaneously, the other officer held a gun on appellant, told her not to move, took her purse from her hands and upended it. From the contents that spilled out he found some .32 caliber shells and a ski mask similar to the ones worn during the Spa robbery, at which juncture appellant was formally placed under arrest.

Both appellant and Martin were given their *Miranda* warnings. Both waived their privilege against self-incrimination and made statements to the police. When Martin was asked if the Rabbit was his, he replied that he had stolen the car in California. When asked what was in it, he stated that there was a shotgun in the back. The 12-gauge shotgun was removed and the car was subsequently impounded. Martin later made a statement to the Santa Barbara police regarding the instant case. This statement was admitted into evidence at appellant's trial, following Martin's death under undisclosed circumstances. Testimony regarding the Fort Worth crimes and the flight to Las Vegas was also admitted into evidence.

### DEFENSE

Appellant testified that she drove Empey and Martin to the Spa on January 6, 1978, and knew that they intended to commit a robbery. She did not see them again until she returned to her apartment. As she returned, Empey and Martin were walking out of her apartment. Appellant first heard of the events relative to the Spa robbery and Faust murder when she accompanied them on the drive that culminated in their burning the pickup truck.

During their travels after leaving Fort Worth, appellant knew guns were in the car and occasionally carried the pistol into a motel room. She had handed the pistol to Martin from the glove compartment in the station wagon when they were stopped by the state police. When they reached Santa Barbara, they slept by the road one night and a police officer approached and talked to Martin. He made no move to obtain the pistol.

Appellant further testified that after Martin's station wagon broke down, she was aware that they needed to obtain another automobile. While she did not want Martin to steal one, she feared that he might. When Martin saw Knox's car, he told her that he intended to steal it. Martin told Knox that appellant was ill; Knox offered them transportation to a hospital. When appellant and Martin entered the car with Knox, she was unaware of Martin's exact plan. He had not stated that he would use the pistol. However, Martin did produce the pistol and point it at Knox. During the drive, Martin continually told Knox that he would not be harmed. Appellant believed that Martin intended to free Knox.

When they came to an isolated area, Martin stopped and told Knox that he would be released there. Martin and Knox walked to the rear of the car to remove the luggage. After they reached the rear of the car, appellant heard a gunshot. Until that moment, she was unaware that Martin intended to kill Knox. Hearing the volley of shots, appellant testified she was shocked and that she tried to stop Martin and convince him to leave.

A psychiatrist testified on behalf of appellant that she was immature and detached with a poor self-concept. She was somewhat schizoid and very attached to Martin as something of a father figure. In the psychiatrist's opinion, appellant would tend to believe anything Martin said.

ISSUES

1. Whether the trial court erroneously denied appellant's 1538.5 motion to suppress the following evidence:

a. The single-shot shotgun seized from appellant's Fort Worth apartment pursuant to a search warrant alleged to be invalid;

b. .32-caliber shells and a ski mask seized from appellant's purse in a search incident to her arrest also alleged to be invalid;

c. Evidence seized from the white Volkswagen Rabbit in a warrantless search.

2. Whether the admission into evidence of Jerry Martin's extrajudicial statement, as a declaration against penal interest under Evidence Code section 1230, denied appellant her right to confront witnesses as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution.

3. Whether it was prejudicial error for the trial court to admit evidence of the Texas crimes pursuant to Evidence Code sections 1101, subdivision (b) and 352.

4. Whether Welfare and Institutions Code section 707.2 required the trial court to obtain a California Youth Authority diagnostic report before sentencing appellant to state prison.

5. Whether the juvenile court's order certifying appellant as unfit for juvenile court treatment, pursuant to Welfare and Institutions Code section 707, subdivision (b), denied her the equal protection of the law guaranteed by the Fourteenth Amendment of the United States Constitution.

6. Whether appellant is entitled to presentence good time/work time *Sage* credits.

## DISCUSSION

*Propriety of Denial of the Motion to Suppress Evidence*

Appellant first contends that the trial court erroneously denied her motion to suppress evidence pursuant to Penal Code section 1538.5. We disagree.

Initially, appellant asserts that an entry into her apartment on January 9, 1978, in an attempt to execute an arrest warrant for Jerry Martin, and ensuing observation of the single-shot shotgun in her closet, were illegal. Therefore, she urges, the search warrant obtained in Fort Worth on January 12, 1978, should be considered invalid as the fruit of

that illegal entry and observation because the recitation of those facts in the supporting affidavit fatally tainted the magistrate's neutral consideration. For purposes of discussion, we assume without deciding that the entry was illegal.

■ The admissibility of evidence gathered in searches made pursuant to warrants is tested by "'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" (*Wong Sun* v. *United States* (1963) 371 U.S. 471, 488 [9 L.Ed.2d 441, 455, 83 S.Ct. 407]; accord *People* v. *Gordon* (1978) 84 Cal.App.3d 913, 925 [149 Cal.Rptr. 91].) One means by which the prosecution may meet the burden of showing that any taint has been attenuated is to establish that the tainted information would have been discovered by the police in the ordinary course of a lawful investigation. (*Lockridge* v. *Superior Court* (1970) 3 Cal.3d 166, 170 [89 Cal.Rptr. 731, 474 P.2d 683]; *People* v. *Gordon, supra*, 84 Cal.App.3d 913, 925.)

■ It is clear that the police had already obtained a great deal of information about the Spa robbery/murder before their entry into appellant's apartment on January 9, 1978. They had interviewed witnesses and knew the identities of Martin and Empey. They had a list of the stolen property. Moreover, they knew that appellant was Martin's girl friend and lived at that particular address. In addition, the police would have come by Empey's information in any case. He voluntarily surrendered to the Fort Worth authorities. He chose to reveal the details of the Spa crimes and the subsequent flight, including his own involvement. Included in the information which Empey supplied to the police was the fact that the single-shot shotgun had been left in appellant's apartment. Nothing the police saw in appellant's apartment on January 9th affected the outcome of this chain of events.

The issuance of the warrant was not fatally tainted by the recitation of the January 9th entry and observation in the affidavit. ■ ■ ■ ■ *Krauss* v. *Superior Court* (1971) 5 Cal.3d 418, 423 [96 Cal. Rptr. 455, 487 P.2d 1023][2] held that an illegal confirmatory search

[2]The entry in question occurred before the decision in *People* v. *Cook* (1978) 22 Cal.3d 67, 99, footnote 18 [148 Cal.Rptr. 605, 583 P.2d 130], which states: "Because official reliance has doubtless been placed heretofore on *Krauss*, the rule we now adopt [that a warrant based on an illegal confirmatory search is invalid] will, except as to the

does not invalidate a search warrant based on lawfully obtained information amounting to probable cause. Appellant attempts to distinguish *Krauss* as involving an affidavit which omitted all mention of the illegal search. However, *Krauss* was followed by *Theodor* v. *Superior Court* (1972) 8 Cal.3d 77 [104 Cal.Rptr. 226, 501 P.2d 234]. ▮ *Theodor* held that unreasonable misstatements of fact in an affidavit must be excised and the remainder tested by the standard of probable cause. (*Id.,* at p. 97.) There is no substantial difference in effect between the presence of untruthful information and the presence of illegally obtained information in an affidavit. Each "impede(s) the function of the magistrate" to an equal degree. (*Ibid.*) Therefore, we determine that *Krauss* v. *Superior Court, supra,* 5 Cal.3d 418 and *Theodor* v. *Superior Court, supra,* 8 Cal.3d 77 must be read together as requiring the excision of all tainted information. (See also *People* v. *Kurland, supra,* 28 Cal.3d 376.)

The facts challenged as tainted are: "B...On January 9, 1978, your Affiant...went to Mary Garcia's apartment with a felony arrest warrant for the arrest of Jerry Lynn Martin. Believing the aforenamed actor to be in the apartment and getting no response by knocking on the door, these officers entered Mary Garcia's apartment and while searching the apartment for...Martin, these officers observed a single-shot shotgun but no other weapons in the only closet in the apartment. ...nothing was removed from the apartment....

" . . . . . . . . . . . . . . .

"D. On January 12, 1978, your Affiant was informed by Mr. Harmon Baker, 1421 Grand Avenue, Apartment I, manager of all apartments located at 1421 and 1423 Grand Avenue, that on the morning of January 12, 1978, he was in Mary Garcia's apartment to check on a broken window pane and that while in the apartment he observed a single shot shotgun in plain view in the closet of Mary Garcia's apartment."[3] We excise these portions of the affidavit and consider

present defendant, be applicable only to searches conducted after this opinion becomes final." Moreover, a negligent misrepresentation does not require that the warrant be quashed. (*People* v. *Kurland* (1980) 28 Cal.3d 376 [168 Cal.Rptr. 667, 618 P.2d 213].) A good faith effort to execute an arrest warrant, which nonetheless fails to meet the applicable standards of the law, is more akin to a negligent misrepresentation than to an intentional one.

[3]Appellant suggests that these facts are tainted by the fact that Mr. Baker may have been induced to report his observation to the police because of their earlier visit and illegal entry. Because we need not reach this issue, we do not.

appellant's second contention that the search warrant is invalid because the remaining facts set forth are insufficient to establish probable cause.

█ In order for a search warrant to issue from an affidavit, the facts therein must be sufficient to lead a person of ordinary caution or prudence to believe and entertain a strong suspicion of the accused's guilt. (*Theodor* v. *Superior Court, supra*, 8 Cal.3d 77, 96; *Skelton* v. *Superior Court* (1969) 1 Cal.3d 144, 150 [81 Cal.Rptr. 613, 460 P.2d 485]; *People* v. *Stout* (1967) 66 Cal.2d 184, 192-193 [57 Cal.Rptr. 152, 424 P.2d 704].) █ The standards applicable to review on appeal are well-enunciated in *People* v. *Emanuel* (1978) 87 Cal.App.3d 205 [151 Cal.Rptr. 44]: "[I]t is well settled that '"[t]he warrant can be upset only if the affidavit fails *as a matter of law* to set forth sufficient competent evidence supportive of the magistrate's finding of probable cause since it is the function of the trier of fact, not the reviewing court, to appraise and weigh evidence when presented by affidavit. . . .'" (Italics in original. *People* v. *Benjamin* (1969) 71 Cal.2d 296, 302 [78 Cal. Rptr. 510, 455 P.2d 438], citing *People* v. *Govea* (1965) 235 Cal.App. 2d 285, 297 [45 Cal.Rptr. 253].) In examining the affidavit for sufficiency of the facts therein to support the magistrate's finding of probable cause, it is axiomatic that the courts are to interpret the affidavit in a common sense, nontechnical manner. (*United States* v. *Ventresca* (1965) 380 U.S. 102, 108-109 [13 L.Ed.2d 684, 688-689, 85 S.Ct. 741]; *People* v. *Mesa* (1975) 14 Cal.3d 466, 469 [121 Cal.Rptr. 473, 535 P.2d 337].) The reviewing court will pay substantial deference to the magistrate's determination of probable cause (*Aguilar* v. *Texas* (1964) 378 U.S. 108, 111 [12 L.Ed.2d 723, 726-727, 84 S.Ct. 86]) and may sustain a search where one without a warrant would fail (*United States* v. *Ventresca, supra*, 380 U.S. 102, 109 [13 L.Ed.2d 684, 689])." (At pp. 212-213.)

█ In addition, the sufficiency of an affidavit based on an informant's hearsay statement will be tested by the following criteria: ". . .(1) The affidavit must allege the informant's statement in language which is factual rather than conclusionary and must establish that the informant spoke with personal knowledge of the matters contained in the statement; and (2) the affidavit must contain some underlying factual information from which the magistrate issuing the warrant can reasonably conclude that the informant was credible or his information reliable. [Citations.]" (*People* v. *Superior Court* (*Johnson*) (1972) 6 Cal.3d 704, 711 [100 Cal.Rptr. 319, 493 P.2d 1183].) Since appellant

asserts that the affidavit is insufficient because the informant Empey was untested and not proven reliable, the second criterion is at issue.

The affidavit recites the background information obtained by the Fort Worth authorities relating to the Spa crimes.[4] It further recites that "(t)his offense [robbery] has been reported and filed under crime report number 7S-H-1 . . . ." Although inartfully stated, the logical inference to be drawn is that the information recited in paragraphs A and B of the affidavit was obtained through normal police investigatory procedures. Though lacking in detail as to its root source, this information, at the very least, provides ample corroboration for Empey's statement.[5] Corroborating information "need not itself amount to reasonable cause . . .; its only purpose is to provide the element of 'reliability' missing . . . ." (*People v. Lara* (1967) 67 Cal.2d 365, 374-375 [62 Cal.Rptr. 586, 432 P.2d 202]; *People v. Turnage* (1975) 45 Cal.App.3d 201, 206 [119 Cal.Rptr. 237].)

■ In any case, Empey's statement was not merely an accusation against the appellant as implicated in crime with him, but "was information relating to the location of stolen goods which, if discovered, could be used as evidence against . . . [Empey] himself. Thus, there is, in the nature of the statement, an internal guaranty of reliability." (*Skelton v. Superior Court, supra*, 1 Cal.3d 144, 154, fn. 7; see *People v. Hall* (1974) 42 Cal.App.3d 817, 823 [117 Cal.Rptr. 228]; *People v. McFadden* (1970) 4 Cal.App.3d 672, 688 [84 Cal.Rptr. 675]; *United States v. Harris* (1971) 403 U.S. 573, 585 [29 L.Ed.2d 723, 734-735, 91 S.Ct. 2075].) This alone supplies a sufficient underlying circumstance to establish Empey's reliability.[6]

---

[4]The affidavit states, in pertinent part: "A. Richard Foust [sic], who managed the 820 SPA (massage studio) located at Loop 820 and Highridge Road, Tarrant County, Texas, was robbed at gun point on the night of January 6, 1978, by two masked males. The robbers were later identified as Thomas Patrick Empey and Jerry Lynn Martin. At the time of the robbery, Empey and Martin took approximately $1,200.00 cash, a pump shotgun, a single shot shotgun, and a pellet gun. Richard Foust was subsequently shot to death by the robbers. B. Investigation by the Tarrant County Sheriff's Department disclosed Mary Garcia, W/F, age 17, is the girl friend of Jerry Lynn Martin and that she had rented an apartment located at 1423 Grant Avenue, Fort Worth, Texas."

[5]The affidavit states, in pertinent part: "C. I have been informed that the afore described single shot shotgun as described in this affidavit is concealed in the afore described building, in Mary Garcia's apartment. This information was obtained from Thomas Patrick Empey, white male, age 21, who was one of the actor's who robbed Richard Foust [sic] on January 6, 1978, and along with another actor left the afore described shotgun in a closet in Mary Garcia's apartment on or about January 6, 1978."

[6]*People v. Smith* (1976) 17 Cal.3d 845 [132 Cal.Rptr. 397, 553 P.2d 557], relied on by the appellant, does not hold to the contrary. *Smith* deals with the subject of citizen

■ While no single item of information may meet the test for probable cause, information from diverse sources, such as that contained in the subject affidavit, may cumulatively amount to probable cause. (*People v. Sheridan* (1969) 2 Cal.App.3d 483, 488 [82 Cal.Rptr. 695]; see *People v. Remijio* (1968) 267 Cal.App.2d 180, 184 [72 Cal.Rptr. 741]; *People v. Diggs* (1958) 161 Cal.App.2d 167, 171 [326 P.2d 194].)
■ Moreover, we note that "Even though information from an informer is expressed in conclusionary language, and there is no showing why the informer is believed to be reliable on the basis of past experience, a magistrate may properly issue a warrant on the basis of such information if the supporting affidavit also recites facts indicating that reliance on the information is reasonable." (*People v. Superior Court* (*Johnson*)*, supra*, 6 Cal.3d 704, 712.) ■ We hold that the affidavit, as excised, does contain sufficient facts to establish probable cause.

Apart from all of the foregoing, appellant has failed to show any prejudice resulting from the search of her apartment. (*Chapman v. California* (1967) 386 U.S. 18, 23-24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065]; *People v. Watson* (1956) 46 Cal.2d 818, 836-837 [299 P.2d 243].) The single-shot shotgun seized from appellant's apartment was neither introduced into evidence nor alluded to during her trial.

On much the same grounds as those discussed above, appellant asserts that the police lacked probable cause to arrest her. As a result, she avers, the .32 caliber shells and ski mask seized from her purse were the fruits of an illegal arrest. ■ Probable cause to arrest exists if there are sufficient facts and information to make it substantially probable that a crime has been committed and the suspect was involved therein. (*People v. Cook, supra*, 22 Cal.3d 67, 84, fn. 6.)

"'The question of probable cause to justify an arrest without a warrant must be tested by the facts which the record shows were known to the officers at the time the arrest was made.'" (*People v. Lara, supra*, 67 Cal.2d 365, 373-374; *People v. Turnage, supra*, 45 Cal.App.3d 201, 205.) At the time of appellant's arrest, the Fort Worth police knew from Empey that a single-shot shotgun stolen in the robbery of the Spa

---

informants versus "mere informants." The court states: "(n)othing appears which would establish him as, on the one hand, *a participant in the illegal activities or* as, on the other hand, an observer whose presence there was innocent." (*Id.*, at p. 852.) Either *prong would add to reliability.*

had been left in appellant's apartment, that she was traveling with Martin, that she and Martin were armed with a stolen 12-gauge shotgun and a pistol, that she had driven Empey and Martin to the Spa with full knowledge that they were going to rob it, and that she had been present when they burned Faust's pickup truck.

As discussed above, any contention that the police could not reasonably rely on Empey's information will not withstand scrutiny. Empey's self-incrimination in the robbery, murder and possession of stolen goods provided an "internal guaranty of reliability." (*People* v. *Skelton, supra*, 1 Cal.3d 144, 154, fn. 7.) Moreover, the police had a wealth of independent evidence that a felony had been committed, that Martin was a principal in its commission, and that appellant had a close connection with Martin. That knowledge alone gave credence to Empey's story. (*People* v. *Lara, supra*, 67 Cal.2d 365, 375; *People* v. *Hall, supra*, 42 Cal.App.3d 817, 823.)

At the time of appellant's arrest, the police officers had probable cause to arrest her as an accessory to the Fort Worth crimes.[7] Thus, the subsequent search of her purse was not tainted by an illegality of the arrest. It is well settled that the police may conduct a limited warrantless search for weapons or contraband incident to a lawful arrest. An officer may not only search the person of the arrestee, but may extend his search to the area into which an arrestee could reach for a weapon. (*Chimel* v. *California* (1969) 395 U.S. 752, 763 [23 L.Ed.2d 685, 694, 89 S.Ct. 2034].) When appellant was arrested, her purse was in her hand. A purse is generally large enough to conceal a weapon. Thus, it was a likely repository for a weapon into which appellant could easily reach. Accordingly, under the authority of *Chimel*, the search was fully justified.

Appellant also argues that the warrantless search of the white Volkswagen Rabbit led to the prejudicial admission of evidence against her. We question seriously whether appellant ever properly raised the issue below. Appellant stated in her moving papers pursuant to Penal Code section 1538.5 that she would move to suppress evidence seized in a warrantless search of the Rabbit. But she did not submit points and au-

[7]Penal Code, section 32: "Every person who, after a felony has been committed, harbors, conceals, or aids a principal in such felony, with the intent that said principal may avoid...arrest, trial, conviction or punishment, having knowledge that said principal has committed such felony..., is an accessory to such felony."

thorities in support of, argue the propriety of granting, or even make such a motion.

Appellant suggests that the issue nonetheless was properly raised by its merest mention in her pleading because a defendant makes a prima facie case that a search and seizure are illegal when it is established that they were done without a warrant. (*People* v. *Haven* (1963) 59 Cal.2d 713, 717 [31 Cal.Rptr. 47, 381 P.2d 927].) A silent record will then require suppression of the evidence. (*People* v. *Berutko* (1969) 71 Cal.2d 84, 90 [77 Cal.Rptr. 217, 453 P.2d 721].) However, it has long been settled that the mere allegation of a fact in a pleading is not itself evidence of that fact. No evidence of a warrantless search of the Rabbit was presented at the hearing on the motion. Appellant's failure to present evidence establishing that the search of the Rabbit was done without a warrant, or to make a motion to suppress any evidence so discovered, deprived the People of any opportunity to cure a possible defect. (*People* v. *Rogers* (1978) 21 Cal.3d 542, 547-548 [146 Cal. Rptr. 732, 579 P.2d 1048].)

As a general rule, "questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court.... The contrary rule would...'permit the defendant to gamble on an acquittal at his trial secure in the knowledge that a conviction would be reversed on appeal.' [Citation.]" (*People* v. *Rogers, supra*, 21 Cal.3d 542, 548; see *People* v. *Privitera* (1979) 23 Cal.3d 697, 710 [153 Cal.Rptr. 431, 591 P.2d 919].) Appellant's failure to establish that a warrantless search occurred amounts to the absence of a specific and timely objection. The issue is not properly before this court and will not be considered.

### Admissibility of Martin's Extrajudicial Statement

Appellant next avers that the trial court's admission of Martin's extrajudicial statement as a declaration against penal interest[8] denied her the right to confront witnesses as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution. Appellant's contention is unfounded.

---

[8]Evidence Code section 1230 provides in pertinent part: "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made,...so far subjected him to the risk of...criminal liability...that a reasonable man in his position would not have made the statement unless he believed it to be true."

■ Constitutional requirements demand that a declaration against penal interest be admissible under Evidence Code section 1230 only as to those statements which are specifically disserving to the interests of the declarant. No collateral assertions can be permitted. (*People v. Leach* (1975) 15 Cal.3d 419, 441 [124 Cal.Rptr. 752, 541 P.2d 296]; *People v. Coble* (1976) 65 Cal.App.3d 187, 192 [135 Cal.Rptr. 199].) The statements must be distinctly against the declarant's penal interest and must be clothed with indicia of reliability. (*Ibid.*; see *People v. Shipe* (1975) 49 Cal.App.3d 343, 354 [122 Cal.Rptr. 701].) Moreover, even where these requirements have been met, the statements must be excluded if they are so rife with condemning facts against the defendant that they are devastating or crucial to her case. (*People v. Bullard* (1977) 75 Cal.App.3d 764, 771 [142 Cal.Rptr. 473]; *People v. Coble, supra*, 65 Cal.App.3d 187, 194; *Dutton v. Evans* (1970) 400 U.S. 74, 87 [27 L.Ed.2d 213, 226, 91 S.Ct. 210].)

■ In the instant case, Martin's statement recounted the events leading up to and culminating in the robbery and murder of Knox. Martin told the Santa Barbara sheriff's deputy questioning him that he pulled the pistol on Knox shortly after getting in the car, before they pulled out of the parking lot. When Knox began to speed up, Martin told him to slow down or "I am shooting him and the law." Martin stated that he had a shotgun wrapped in a blanket in the back of Knox's car. When he eventually had Knox pull over and walked with him to the back of the car, he shot Knox with the pistol. He kept shooting Knox because he was moving and moaning. Martin stated that he did not want to shoot Knox, but "it was me or him." Martin said he did it because he needed a car. He wasn't after the money. But after he shot Knox, he rolled his body over and took his wallet. He wasn't thinking of much but just getting out of the city.[9]

Although made after his arrest, Martin's statement is wholly inculpatory. He did not attempt to shift the greater blame to appellant. And he no longer had any motive to fabricate because he knew that the police could identify his pistol as the murder weapon. In addition, Martin subjected himself to the possibility of a death sentence, thereby increasing the reliability of the statement. (See *Skelton v. Superior Court, supra*, 1 Cal.3d 144, 154, fn. 7.)

---

[9]Martin's statement was considerably more detailed than this brief summary, covering several pages of the trial transcript. However, the detail covered precisely how, when and in what sequence he acted. None of the detail implicates appellant.

In addition, Martin's statement cannot be considered crucial or devastating to appellant's case. (*People* v. *Bullard, supra,* 75 Cal.App.3d 764, 771.) The trial court carefully excised all references to "we" in the original statement which might have implicated appellant and substituted the word "I." The statement as it was admitted in evidence never referred to appellant in any way. (See *People* v. *Manson* (1976) 61 Cal.App.3d 102, 150 [132 Cal.Rptr. 265].) Therefore, the statement was merely corroborative evidence offered on the issue of whether a certain crime occurred in a certain manner. As such, it was collateral to the issue of appellant's guilt or innocence, and its admission did not violate appellant's constitutional right to confrontation.

## Admissibility of Evidence of Prior Bad Acts

Appellant further contends that it was prejudicial error for the trial court to admit evidence of the Texas crimes and subsequent armed flight. She raises this issue on two grounds: (1) that the prejudicial effect of such evidence outweighed any probative value; and (2) that the trial court erroneously allowed the jury to consider the evidence for an improper purpose. We disagree.

■ Evidence Code section 1101, subdivision (b)[10] allows the admission of evidence of prior crimes where relevant to prove facts such as motive, intent or knowledge; however, Evidence Code section 352[11] allows the court to exercise its discretion to exclude such evidence where its probative value is outweighed by its prejudicial effect. The connection of the evidence of prior crimes with the crime charged must be clearly perceived, and it has sufficient probative value only when it ""tends logically, naturally, and by reasonable inference, to establish any fact material for the People, or to overcome any matter sought to be proved by the defense." [Citation.]" (*People* v. *Haston* (1968) 69 Cal.2d 233, 247 [70 Cal.Rptr. 419, 444 P.2d 91]; see *People* v. *Sam* (1969) 71 Cal.2d 194, 203 [77 Cal.Rptr. 804, 454 P.2d 700].)

---

[10]Evidence Code section 1101, subdivision (b) states, in pertinent part: "Nothing in this section prohibits the admission of evidence that a person committed a crime... when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge...) other than his disposition to commit such acts."

[11]Evidence Code section 352 provides, in pertinent part: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will...(b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

■ In contending that evidence of her involvement in the events occurring in Texas and during the subsequent flight to Las Vegas, Nevada is more prejudicial than probative, appellant "overlooks the great probative value of the evidence in throwing light upon [her] state of mind...." (*People* v. *Durham* (1969) 70 Cal.2d 171, 187-188 [74 Cal.Rptr. 262, 449 P.2d 198].) As this court stated in *People* v. *Powell* (1974) 40 Cal.App.3d 107, 155 [115 Cal.Rptr. 109,: "[t]he entire circumstance of the killing is germane in determining appellant's state of mind." (See also *People* v. *Enos* (1973) 34 Cal.App.3d 25, 40 [109 Cal.Rptr. 876].) Moreover, in *People* v. *Terry* (1970) 2 Cal.3d 362, 396 [85 Cal.Rptr. 409, 466 P.2d 961], the court ruled that very similar evidence was admissible as evidence of the appellant's knowledge of her coactor's criminal design, thus tending to rebut her claim of ignorance.

Not only is other-crimes evidence relevant and material to the issues of motive, intent, and knowledge, it is often necessary. (*People* v. *Lynn* (1971) 16 Cal.App.3d 259, 268 [94 Cal.Rptr. 16].) We find that to be true in the instant case. The People bore the burden of proving that appellant was something other than an innocent bystander suddenly thrust into criminal activity of which she was theretofore ignorant. The issue of her intent, as reflected by motive and knowledge, was critical to the People's case. Therefore, evidence of her earlier criminal association with Martin was necessary to the case in chief.

■ Appellant fares no better with her contention that she was prejudiced by the trial court's error in instructing the jury that the evidence could be considered as indicative of a common plan, scheme or design. That portion of the instruction did constitute error. The evidence must be relevant and admissible with respect to each issue on which the trial judge instructs, or he has committed error. (*People* v. *Swearington* (1977) 71 Cal.App.3d 935, 947 [140 Cal.Rptr. 5].) To be admissible, evidence of a common plan or scheme must exhibit "common marks" between the uncharged and the charged offenses which "logically operate to set the charged and uncharged offenses apart from crimes of the same general variety." (*People* v. *Haston, supra*, 69 Cal.2d 233, 246; *People* v. *Alvarez* (1975) 44 Cal.App.3d 375, 386 [118 Cal.Rptr. 602].) Obviously, there are significant differences between the Texas crimes and the California crimes.

However, error alone is not enough. We must consider the question of prejudice. In *People* v. *Swearington, supra*, 71 Cal.App.3d 935, the

trial judge erroneously instructed that the evidence could be considered on three separate irrelevant issues. Here, in contrast, the trial judge correctly instructed that the evidence could be considered on the three issues of intent, motive and knowledge, while only instructing erroneously on the one irrelevant issue of a common plan, scheme or design. Moreover, the differences between the two crimes are so notable that the irrelevancy of the instruction is obvious. Finally, the instruction clearly stated that the jury could not consider this evidence to prove that the appellant was a person of bad character or had a disposition to commit crime. Accordingly, we adopt the reasoning of *People* v. *Haslouer* (1978) 79 Cal.App.3d 818, 830 [145 Cal.Rptr. 234]: "[W]e cannot find that the jury was so confused by the erroneous inclusion of the issue of [common plan or scheme] that the defendant suffered any injustice therefrom.... We cannot find that sans this error it is reasonably probable that a different result would ensue. (Cal. Const., art. VI, § 13; *People* v. *Watson* [1956] 46 Cal.2d 818, 836 ....)"

*Necessity for a Youth Authority Diagnostic Report*

 Appellant next submits as error the trial court's failure to order a Youth Authority diagnostic report as required by Welfare and Institutions Code section 707.2.[12] We find no error. The stated purpose of such a report under 707.2 is to evaluate a minor's "amenability to training and treatment offered by the Youth Authority." The restriction imposed on the trial court is against sentencing a minor to state prison prior to determining that a minor "is a suitable subject for commitment to the Youth Authority." However, Welfare and Institutions Code section 1731.5, subdivision (b)[13] represents a legislative determination that

---

[12]Welfare and Institutions Code section 707.2 provides: "Prior to sentence, the court of criminal jurisdiction may remand the minor to the custody of the California Youth Authority for not to exceed 90 days for the purpose of evaluation and report concerning his amenability to training and treatment offered by the Youth Authority. No minor who was under the age of 18 years when he committed any criminal offense and who has been found not a fit and proper subject to be dealt with under the juvenile court law shall be sentenced to the state prison unless he has first been remanded to the custody of the California Youth Authority for evaluation and report pursuant to this section and the court finds after having read and considered the report submitted... that the minor is not a suitable subject for commitment to the Youth Authority."

[13]Welfare and Institutions Code section 1731.5, subdivision (b) provides: "After certification to the Governor as provided in this article a court may commit to the authority any person convicted of a public offense who comes within subdivisions (a), (b), and (c), or subdivisions (a), (b), and (d), below:

"(b) Is not sentenced to death, imprisonment for life,...."

minors who are sentenced to life imprisonment are not suitable for Youth Authority commitment.

Section 707.2 of the Welfare and Institutions Code is a general statute dealing with the same subject as the specific legislation of section 1731.5. ██ Where a general statute standing alone includes the same subject matter as a specific act, the latter governs the former whether passed before or after the general statute. (*People v. Tanner* (1979) 24 Cal.3d 514, 521 [156 Cal.Rptr. 450, 596 P.2d 328]; *People v. Gilbert* (1969) 1 Cal.3d 475, 479 [82 Cal.Rptr. 724, 462 P.2d 580]; *People v. Grisso* (1980) 104 Cal.App.3d 380, 386 [163 Cal.Rptr. 547].) The courts are bound to maintain the integrity of both statutes if an apparent conflict can be reconciled. (*Associated Home Builders etc., Inc. v. City of Livermore* (1976) 18 Cal.3d 582, 596 [135 Cal.Rptr. 41, 557 P.2d 473, 92 A.L.R.3d 1038]; *In re White* (1969) 1 Cal.3d 207, 212 [81 Cal.Rptr. 780, 460 P.2d 980].) ██ The purpose of section 707.2 is to avoid the imprisonment of minors who are suitable for commitment to the Youth Authority. There is no conflict in excepting from its provisions those minors who may not be referred to the Youth Authority by the terms of section 1731.5 of the Welfare and Institutions Code. The two statutes can be read together and reconciled. We conclude that the trial court need not, but may, if it concludes that a diagnostic report would aid in sentencing, remand a minor defendant to the Youth Authority prior to sentencing the minor to state prison if the convicted minor is not eligible for the training and treatment offered by the Youth Authority.[14]

██ Appellant asserts that a Youth Authority diagnostic report nevertheless was required because present Penal Code section 190, enacted on November 7, 1978, applies to her. Appellant committed the offenses of which she was convicted prior to November 7, 1978, while former Penal Code section 190, now repealed, was in effect. Therefore, whether the present section has retroactive application to appellant depends on

---

[14]Appellant argues that a diagnostic report should be required because the trial court could have stayed execution of the murder sentence and the robbery sentence would then have made her eligible for Youth Authority commitment. While the trial court could have stayed the murder sentence (see *People v. Wesley* (1970) 10 Cal.App.3d 902 [89 Cal.Rptr. 377]), it did not. We will not indulge in unfounded speculation as to its course of action had a diagnostic report been before it. In any case, the court had the benefit of a probation report.

whether it increases or decreases the punishment for the offense in question.

Former Penal Code section 190 fixed the penalty for first degree murder at "confinement in the state prison for life," while present section 190 establishes the penalty as "confinement in the state prison for a term of 25 years to life." As a matter of law, this latter penalty is for an indeterminate term less than life imprisonment, and would appear to reduce the penalty for first degree murder. (See *In re Jeanice D.* (1980) 28 Cal.3d 210, 216 [168 Cal.Rptr. 455, 617 P.2d 1087].) However, as read with Penal Code section 3046,[15] former section 190 permitted eligibility for parole after serving seven years. In contrast, present section 190 requires that a minimum of 16 years and 8 months be served before one is eligible for parole.[16] A statute which increases the time to be served before one is eligible for parole consideration increases punishment and is ex post facto as to one whose crime was committed prior to the statute's enactment. (*In re Griffin* (1965) 63 Cal.2d 757, 760 [48 Cal.Rptr. 183, 408 P.2d 959]; *People* v. *Grisso, supra,* 104 Cal.App.3d 380, 387.) Accordingly, the California Supreme Court has recognized that present Penal Code section 190 does in fact increase the penalty for first degree murder. (*In re Jeanice D., supra,* 28 Cal.3d 210, 219-220, fn. 9.)

Nevertheless, appellant insists that *In re Jeanice D.*'s holding that a minor sentenced under present Penal Code section 190 is eligible for Youth Authority commitment pursuant to Welfare and Institutions Code section 1731.5 confers upon her a substantial sentence-mitigating benefit which requires retroactive application. (*In re Estrada* (1965) 63 Cal.2d 740, 745 [48 Cal.Rptr. 172, 408 P.2d 948]; see also *People* v. *Benefield* (1977) 67 Cal.App.3d 51 [136 Cal.Rptr. 465].) In support of this position, appellant relies on Welfare and Institutions Code section 1771.[17] We concede that section 1771's provision for virtually manda-

---

[15]Penal Code section 3046 provides in relevant part: "No prisoner imprisoned under a life sentence may be paroled until he has served at least seven calendar years."

[16]Penal Code section 190 currently provides, in pertinent part: "The provisions of Article 2.5 (commencing with Section 2930) of Chapter 7 of Title 1 of Part 3 of the Penal Code shall apply to reduce any minimum term of 25...years in a state prison imposed pursuant to this section, but such person shall not otherwise be released on parole prior to such time."

[17]Welfare and Institutions Code section 1771 provides in relevant part: "Every person convicted of a felony and committed to the [youth] authority shall be discharged when such person reaches his 25th birthday, unless an order for further detention has been made by the committing court pursuant to [factors not relevant here]."

tory release from Youth Authority commitment at the twenty-fifth birthday would benefit appellant more than parole eligibility following seven years imprisonment.

However, appellant overlooks an important consideration. *In re Jeanice D.* merely holds that a minor convicted under present Penal Code section 190 is *eligible* for Youth Authority commitment. If present Penal Code section 190 were applied retroactively to appellant and she were in fact sentenced to state prison, she would face a minimum confinement of sixteen years and eight months—a substantially greater penalty than the minimum seven years confinement she presently faces.

In essence, appellant seeks to reap the benefit of the application of present Penal Code section 190 while eschewing the detriment. This cannot be. Either the revision of Penal Code section 190 increases the penalty when read as a whole or it does not. The clear detriment apparent in the vastly increased period of confinement required prior to parole eligibility does increase the penalty.[18] Accordingly, we hold that retroactive application of present Penal Code section 190 would be ex post facto as to appellant. She remains a person sentenced under former Penal Code section 190 and thus ineligible for Youth Authority commitment.

*Validity of Juvenile Court Certification Order*

Appellant further contends that the juvenile court's order certifying her as unfit for juvenile court treatment, pursuant to Welfare and Insti-

---

[18]*People* v. *Benefield, supra,* 67 Cal.App.3d 51 does not require that we reach a different conclusion. *Benefield* held that an amendment to Welfare and Institutions Code section 707.2 which increased the possibility that a minor could be sentenced to the Youth Authority constituted a decrease in the sentence to which the minor was subject. However, the *Benefield* court applied amended section 707.2 to the statute under which the defendant had been sentenced. The court was not faced with the situation at hand, where a revision of a sentencing statute has both increased the penalty and resulted in eligibility for Youth Authority commitment. Therefore, we consider *In re Griffin, supra,* 63 Cal.2d 757, 761 to be governing.

*Griffin* dealt with an amendatory statute which decreased the minimum term of imprisonment but increased the minimum parole eligibility date. In essence, this is the effect of reading *In re Jeanice D.* with Welfare and Institutions Code section 1771. A Youth Authority commitment would result in a substantially reduced minimum term of imprisonment under section 190, but a prison commitment would result in a substantially increased parole eligibility date. As the court concluded in *Griffin,* appellant may not pick and choose among the consequences.

tutions Code section 707, subdivision (b), denied her the equal protection of the law guaranteed by the Fourteenth Amendment of the United States Constitution. We need not address this issue, for appellant has chosen an improper forum in which to raise it. ▌ A juvenile court certification hearing is an extrajudicial process insofar as subsequent criminal proceedings are concerned; thus, an order of certification may not be reviewed on appeal from a criminal judgment of conviction. (*People* v. *Chi Ko Wong* (1976) 18 Cal.3d 698, 710 [135 Cal.Rptr. 392, 557 P.2d 976]; *People* v. *Grisso, supra*, 104 Cal.App.3d 380, 388.)

A juvenile court certification order is properly attacked only by extraordinary writ in collateral proceedings commenced prior to trial on the criminal charges. (*People* v. *Chi Ko Wong, supra*, 18 Cal.3d 698, 714.) Appellant did attack the order by extraordinary writ and relief was denied. That was the proper forum for a constitutional attack on the validity of Welfare and Institutions Code section 707, subdivision (b).

*Entitlement to Presentence Conduct Credits*

▌ Finally, appellant urges that she is entitled to presentence good time/work time credits under the doctrine of *People* v. *Sage* (1980) 26 Cal.3d 498 [165 Cal.Rptr. 280, 611 P.2d 874]. We disagree. In *Sage*, the California Supreme Court stated, "Under section 4019, a pretrial detainee eventually convicted of a misdemeanor and sentenced to county jail, hereinafter referred to as a 'detainee/misdemeanant,' receives conduct credit against that sentence for his presentence jail time. Under section 2931, a defendant who makes bail or is released on his own recognizance, then is tried, convicted of a felony and sentenced to state prison receives conduct credit against his full sentence. Only the presentence detainee eventually sentenced to prison, the 'detainee/felon,' does not receive conduct credit against his full sentence, because he is denied conduct credit for his presentence confinement. It is the distinction between the detainee/felon and the felon who serves no presentence time that raises equal protection problems." (*Id.*, at p. 507.) Therefore, the court held that a detainee/felon was entitled to presentence conduct credit.

However, Penal Code section 2931, by its terms, applies only to persons sentenced pursuant to Penal Code section 1170. Appellant was

sentenced to a term of straight life imprisonment pursuant to former Penal Code section 190 and Penal Code section 1168, subdivision (b).[19]

At the time that appellant committed her offense there was no statutory provision for awarding life prisoners conduct credits. (See former Pen. Code, § 190, Stats. 1977, ch. 316, § 5, pp. 1256-1257.) Thus, there was no arbitrary discrimination between classes of life prisoners. The legislative distinction made was between persons sentenced to straight life imprisonment and other felons.

Appellant asserts that under the authority of *In re Kapperman* (1974) 11 Cal.3d 542 [114 Cal.Rptr. 97, 522 P.2d 657], persons sentenced to life imprisonment are deemed to be similarly situated with all other felons.[20] Thus, the equal protection concerns of *People* v. *Sage, supra,* 26 Cal.3d 498 require that the denial of conduct credits to persons sentenced to life imprisonment be necessary to serve a compelling state interest. Appellant's reliance on *Kapperman* is misplaced.

*Kapperman* held that no rational and legitimate state interest supported the application prospectively only of Penal Code section 2900.5, which granted persons sentenced to state prison presentence custody credits. En route to this conclusion, the court reasoned that the fact that the petitioner faced a sentence with a maximum term of life imprisonment[21] did not set him apart from other felons. Retroactive

---

[19]There has been some suggestion that the straight life sentence contained in Penal Code section 190 prior to its revision November 7, 1978, is a determinate sentence within the terms of Penal Code section 1170 because it states that the penalty shall be death, imprisonment for life without possibility of parole, or imprisonment for life. It is possible to construe this language as lying within the terms of Penal Code section 1168, subdivision (a), which makes section 1170 applicable to any person sentenced under a statute which sets out three different periods of time as punishment. However, we have difficulty discerning the sentences set out in former Penal Code section 190 as any finite periods of time. Moreover, a life sentence with possibility of parole operates in a classically indeterminate manner. A release date, if any, will be set solely by the Board of Prison Terms after considering all relevant factors.

The Legislature's action in drafting the revision of Penal Code section 190 which became effective November 7, 1978, buttresses our belief that a sentence of life imprisonment cannot be considered determinate in any real sense. Had the Legislature believed that section 1170 already applied to life sentences, it would not have felt constrained to specify that the minimum term of 25 years imposed would be reduced in accordance with chapter 2, commencing with section 2930.

[20]As discussed hereinbefore, we need not consider appellant's possible eligibility for presentence conduct credits through the retroactive application of revised Penal Code section 190.

[21]The sentence in *Kapperman* was from five years to life, not straight life imprisonment. (11 Cal.3d at p. 545, fn. 2.)

application of section 2900.5 would serve merely to reduce minimum parole eligibility dates and would have no impact on the Adult Authority's role in determining an ultimate release date. Straight life prisoners eligible for parole well may be like all other felons with regard to credit for actual time spent in custody. However, it is wholly unreasonable to leap from *Kapperman*'s holding concerning presentence custody credits to the general conclusion that persons sentenced to straight life imprisonment are similarly situated with other felons for all purposes.

The legislative scheme devoted to persons sentenced to straight life imprisonment argues against such an analysis. Former Penal Code section 190 provided sentences of straight life imprisonment only for those persons convicted of first degree murder, a particularly heinous crime. The seriousness of the crime and the concommitant danger to public safety immediately suggest differences between these persons and lesser felons. Therefore, we cannot accept appellant's interpretation of *Kapperman*.

Moreover, the purpose served by awarding every felon credit for actual days in confinement, whatever his sentence, is far different from that served by an automatic award of conduct credits. Conduct-credit incentives for good behavior while imprisoned comport well with a determinate sentencing plan. However, even after the enactment of Penal Code section 2931, effective July 1, 1977, the Legislature withheld conduct credits from persons sentenced to straight life imprisonment while granting them to other felons. The Legislature's failure to extend such credits to straight life prisoners when it embarked upon a comprehensive determinate sentencing plan has significance. With respect to felons convicted of offenses sufficiently heinous to invoke a sentence of life imprisonment, a legislative decision to eschew direct incentives for good behavior while imprisoned rationally could reflect a determination that the Legislature desired good conduct to serve as a harbinger of progress toward full rehabilitation and nothing more. Accordingly, we perceive no arbitrary legislative purpose in discriminating against persons sentenced to straight life imprisonment in the matter of conduct credits. Appellant comes neither within the letter nor the spirit of *People* v. *Sage, supra*, 26 Cal.3d 498 and is not entitled to conduct credits.[22]

---

[22]Appellant also argues that the trial court awarded her an incorrect number of presentence custody credits. There is no evidence in the record on appeal to support that contention. Error will not be presumed on appeal. (*Lynch* v. *Birdwell* (1955) 44 Cal.2d 839, 846 [285 P.2d 919]; *People* v. *Guy* (1956) 145 Cal.App.2d 481, 488 [302 P.2d

The judgment is affirmed.

Lillie, J., and Auerbach, J.,* concurred.

A petition for a rehearing was denied February 19, 1981, and appellant's petition for a hearing by the Supreme Court was denied April 1, 1981. Bird, C. J., was of the opinion that the petition should be granted.

657].) Where the record is silent, the court will presume that the trial court's action was justified by the facts before it. (*People* v. *Mitchell* (1962) 209 Cal.App.2d 312, 319 [26 Cal.Rptr. 89].)

*Assigned by the Chairperson of the Judicial Council.